**UNITED STATES of America, Plaintiff,**

v.

**Larry Duane CONNER, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**John Charles TILTON, Defendant.**

**No. CR 96–4010–DEO.**

United States District Court,
N.D.Iowa,
Western Division.

Nov. 22, 1996.

822

Kevin W. Techau, Federal Public Defender's Office, Des Moines, IA, for defendant Conner.

Martha M. McMinn, Sioux City, IA, for defendant Tilton.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE**

Michael Hobart, Asst. U.S. Attorney, Sioux City, IA, for U.S.

BENNETT, District Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND ....................................824

II.  FINDINGS OF FACT ...............................................825

III. LEGAL ANALYSIS ................................................828
   A.  Standing .....................................................829
   B.  Entry And Arrest .............................................831
       1.  Did the door open by consent or upon a demand under color of authority? ...............................................832
       2.  Probable cause ...........................................838
           a.  Detective Iddings's observations .....................838
           b.  Collective knowledge .................................840
       3.  Warrantless entry and arrest .............................843
           a.  The Payton decision ..................................843
           b.  The exigent circumstances exception to the Payton rule ..............845
           c.  Exigent circumstances here ...........................848
               i.  Safety considerations ...........................848
               ii. Destruction of evidence .........................850
       4.  Summary ..................................................850
   C.  Search And Seizure ...........................................850
       1.  Leon and the "good-faith" exception ......................851
           a.  The Leon decision ....................................851
           b.  The Fletcher–White line of authority .................852
           c.  "Good faith" here ....................................852
       2.  Searches incident to warrants ............................854
           a.  The "independent source" rule ........................855
           b.  The "independent source" analysis here ...............857
               i.  Probable cause prong ............................857
               ii. The motivation prong ...........................858

IV.  CONCLUSION .....................................................859

Our Constitution sometimes places high demands on our law enforcement officers not only to do the right thing, but to do it at the right time in the right way.[1]   In this case,

[1]. For example, the Fourth Amendment to the United States Constitution provides as follows:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV. Thus, the Constitution specifies that doing the right thing, effecting an arrest, must be done in the right way and only after certain prerequisites are met.

the defendants were caught with obvious fruits of criminal activity about them. However, they challenge their arrests and the seizure of evidence on the ground that law enforcement officers violated constitutional standards on both when and how seizures of persons and things must be done. Although the government asserts that the defendants opened the door to their motel room by consent when officers knocked, the defendants contend that they opened the door in response to a demand for entry under color of authority. The defendants also contend that their arrests and subsequent seizures of evidence violated the Fourth Amendment, because the officers did not wait for an arrest warrant before entering their motel room to arrest them. The court must consider whether the defendants consented to the entry of police officers into their motel room or instead acquiesced to a show of authority; whether officers had probable cause and exigent circumstances justifying an immediate entry of the motel room and arrest of the defendants without a warrant; whether any constitutional inadequacies in the seizure of evidence may nonetheless be excused under the *Leon* "good-faith" exception; and whether the "independent source" rule will salvage the constitutionality of search warrants and seizures pursuant to the warrants, when the warrants were obtained after the officers' entry into the motel room and were based in part on information gained by that assertedly unconstitutional entry.

## I. INTRODUCTION AND BACKGROUND

The criminal cases in which the motions to suppress evidence now before the court are pending are in federal court by virtue of federal firearms charges. In a two-count indictment returned on February 22, 1996, defendant Larry Duane Conner is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1), and possession of a stolen firearm shipped in interstate commerce in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). In a separate two-count indictment also returned on February 22, 1996, defendant John Charles Tilton is charged with identical offenses.

On April 25, 1996, defendant Conner filed a motion to suppress evidence obtained as a result of the execution of a state search warrant on January 2, 1996, for a motel room registered in his name and occupied by both Conner and Tilton. In that motion, Conner also moves to suppress statements he made to law enforcement officers following his arrest. On May 7, 1996, Conner filed an amendment to his motion in which he moves to suppress evidence obtained as a result of the execution of another state search warrant, also on January 2, 1996, but this time at his residence, following the search of the motel room. Conner contends in his amendment to his motion that evidence obtained pursuant to the second warrant is "derivative evidence" obtained from the prior illegal police activity at the motel, and therefore must be suppressed as the fruit of the poisonous tree. On April 26, 1996, the court granted Conner's request for an evidentiary hearing on his motion to suppress and set Conner's motion down for hearing.

On May 8, 1996, defendant Tilton also filed a motion to suppress evidence that mirrors Connor's original motion. Tilton's motion again seeks to suppress evidence obtained as a result of the execution of the state search warrant for the motel room where Conner and Tilton were staying. Tilton's motion also seeks to suppress any statements Tilton made to law enforcement officers following his arrest.

On May 13, 1996, after the defendants filed their respective motions, the United States moved to consolidate the evidentiary hearing for the two cases. Conner and Tilton consented to the consolidation. On May 14, 1996, the Honorable Donald E. O'Brien, a senior judge of this district, granted the motion to consolidate and ordered that an evidentiary hearing on defendant Tilton's motion to suppress be consolidated with the evidentiary hearing already set by this court for defendant Conner's motion.

The United States timely resisted Conner's and Tilton's motions. The government argues that the police gained consensual visual access to the defendants' motel room when Tilton voluntarily opened the door.

The government further argues that exigent circumstances justified the warrantless arrests of the defendants. Finally, the government contends that, even if Conner's and Tilton's arrests violated the Fourth Amendment, the evidence found in the motel room and at Conner's residence is nonetheless admissible under the *Leon* "good-faith exception." [2]

An evidentiary hearing on the defendants' motions was held on June 21, 1996. At the hearing, the United States was represented by Assistant United States Attorney Michael Hobart. Defendant Conner was represented by Kevin W. Techau of the Federal Public Defender's Office in Des Moines, Iowa. Defendant Tilton was represented by counsel Martha M. McMinn of Sioux City, Iowa. At the hearing, the United States presented the testimony of Sergeant Doug Young, Officer Steve Polak, and Officer Larry Iddings of the Sioux City Police Department. Defendants offered the testimony of Wendie Oestmann and defendant Tilton.

At the close of the evidentiary hearing the court stated that it would permit the parties to file supplemental briefs and then allow the parties oral arguments. The parties subsequently filed supplemental legal memoranda in support of their respective positions, and the court entertained oral arguments on the motions to suppress on August 20, 1996. At the end of oral arguments, the court stated that it would permit the parties to file supplemental briefs solely on the question of the applicability of the "good-faith exception" established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). After the parties filed their supplemental legal memoranda, the court held a further hearing on October 16, 1996, on the applicability of the *Leon* good-faith exception in light of some of *Leon*'s Eighth Circuit progeny, such as *United States v. Fletcher,* 91 F.3d 48, 51–52 (8th Cir.1996); *United States v. Kiser,* 948 F.2d 418 (8th Cir.1991), *cert. denied,* 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992); and *United States v. White,* 890 F.2d 1413 (8th Cir.1989), *cert.*

*denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). This matter is now fully submitted.

## II. FINDINGS OF FACT

The court makes the following findings of fact solely for the purpose of disposing of the present motions to suppress. On December 25, 1995, a burglary was reported at the residence of Golby Uhlir in Sioux City, Iowa. The burglary occurred between December 23, 1995, and December 24, 1995. Property stolen in the burglary included a large coin collection, jewelry, silver place settings, and three handguns. Uhlir informed investigating law enforcement officers, including Sergeant Doug Young and Detective Steve Polak of the Sioux City Police Department Detective Bureau, that the stolen coins and currency had been encased in protective plastic coverings. Uhlir also reported that the stolen coins had been stored in maroon, gold, and blue boxes, which in turn were kept in several brown briefcases. Uhlir also gave the law enforcement officers descriptions of the handguns taken from his residence.

On the morning of January 2, 1996, Deputy Dave Fox of the Woodbury County Sheriff's Office received a telephone call from a person who wished to remain anonymous. This individual informed Deputy Fox that Larry Conner and John Tilton had burglarized the Uhlir residence. The anonymous tipster further told Deputy Fox that Conner and Tilton were staying at a motel or hotel in Sioux City and were driving a red Pontiac Fiero with Iowa license plate WEH624. In addition, the informant told Deputy Fox that Conner and Tilton had the coins with them at the hotel or motel room and that they were planning to leave the city sometime later that day to dispose of the stolen property. After speaking with the individual, Deputy Fox relayed the information obtained to Detective Polak.

Acting on the tip received by Deputy Fox, Sioux City Police investigators were dispatched to check area motels for the red Fiero that Conner and Tilton were supposed

---

**2.** The government unaccountably does not argue in the alternative that the evidence would be admissible under the "independent source rule" even if its argument for the applicability of the *Leon* "good-faith exception" fails.

to be driving. Because three handguns had been taken in the burglary, the investigators were warned that Conner and Tilton might be armed. Sioux City Police Detectives Monlux and Rohde located the red Fiero in front of Room 31 at the Elmdale Motel in Sioux City, Iowa. Detectives Monlux and Rohde radioed for the assistance of other officers, and waited in their police vehicle, which was parked at the rear of the motel.

Sergeant Young, Detective Polak, and Detective Iddings responded to the call from Detectives Monlux and Rohde. Sioux City Police Officer Mark Hein also arrived at the motel. Officer Hein, who was the only police officer in uniform, parked his vehicle at the front of the motel in order to observe the front door of the motel room and the Fiero. The officers' plan was to knock on the front door of the room and attempt to speak to the individuals inside about the information that Deputy Fox had received concerning the Uhlir burglary. Sergeant Young was in charge of the investigation at the motel. Sergeant Young incorrectly assumed that either Detective Monlux or Detective Rohde had checked with the motel office to ascertain who had rented Room 31. At the time the officers approached Room 31 they did not know that the room had been rented to Conner.[3] Apparently the officers approached Room 31 solely because the red Fiero was parked directly in front of it.

Sergeant Young and Officer Hein went to the front door of Room 31, and Detectives Iddings and Polak positioned themselves south of the picture window for Room 31. Detectives Monlux and Rohde took up positions behind the motel. From his vantage point, Detective Iddings noticed packages of coins on the windowsill between the room's curtains and window. Detective Iddings motioned to the coins on the windowsill, but Sergeant Young did not notice Iddings's gesture nor the coins on the windowsill. Detective Iddings did not tell other officers on the scene that he had seen the coins or take any other action to draw the coins to their attention. Although he was assisting the other officers at the motel, Iddings had not previously been involved in the investigation of the Uhlir burglary. As a result, until that morning, Iddings was unfamiliar with the property taken during the Uhlir burglary. Detective Polak informed him that morning that a coin collection had been taken in the burglary and that the car driven by suspects in the burglary had been located at the motel.

Officer Hein knocked on the door of Room 31 and identified himself as a police officer. The officers received no response from the room. Officer Hein knocked again, and announced a second time that they were police officers. Detective Polak indicated to the other police officers that he had seen someone looking out of the picture window of Room 31. In response, Sergeant Young repositioned himself to the north of the door, and withdrew his pistol from its holster and held the pistol behind his back so that it wasn't exposed to anyone's view. Officer Hein again knocked and announced the presence of the officers. Sergeant Young shouted, "Open up," in a voice loud enough to be heard two rooms away by Wendie Oestmann, another resident at the motel.[4] The officers'

---

3. In its initial brief, the government asserted that the police had checked with the motel office prior to knocking on the door to Room 31, and had ascertained that Conner had rented the room. In its reply brief, the Government conceded that the registration information was obtained after the officers had entered Room 31 and arrested Tilton and Conner, but before the applications for the search warrants also at issue in this case were completed.

4. Although there is conflicting testimony as to what Sergeant Young said, the court finds that what Sergeant Young said was, "Open up." Such a statement is consistent with Sergeant Young's initial testimony and the testimony of Wendie Oestmann. At the evidentiary hearing,

Ms. Oestmann, the only neutral witness presented by any party, testified that she heard a police officer call out, "Open up." Tr. at p. 109, 1. 18–19. The court finds the testimony by Ms. Oestmann to be entirely credible on this point. The court has utilized the following factors in assessing the credibility of Ms. Oestmann and the other witnesses who testified at the evidentiary hearing: (1) the interest of the witness in the result of the hearing; (2) the witness's relation to any party in interest; (3) the witness's demeanor upon the witness stand; (4) the witness's manner of testifying; (5) the witness's tendency to speak truthfully or falsely, including the probability or improbability of the testimony given his or her situation to see and observe; (6) the witness's apparent capacity and willingness to tell truthful-

knocking on the door was loud enough to awaken Ms. Oestmann and to cause another female guest of the motel to step out of her room under the mistaken belief that the police were knocking at her door.[5]

A short time after Officer Hein knocked on the door for the third time, Tilton opened the door to the room. Tilton opened the door in response to Sergeant Young's command that he open the door. When Tilton opened the door, Sergeant Young observed what appeared to be foreign currency at the foot of one bed, coins and envelopes the size of currency on the bed, as well as blue, gold, and maroon boxes matching the description given by Uhlir. Believing the currency and other materials he observed to be the proceeds of the Uhlir burglary, Sergeant Young drew his weapon on Tilton and ordered him to back away from the door.[6] Tilton complied with Sergeant Young's request and backed away from the doorway. Sergeant Young and Officer Hein then entered the motel room and secured Tilton by ordering him to the floor and handcuffing him. At that point, the officers observed other coins and coin packages scattered throughout the room as well as three large briefcases sitting in the corner of the motel room that appeared to be similar to those described by Uhlir.

After Tilton was secured, the officers asked Tilton where Conner was, and Tilton told the officers that he was in the motel room's bathroom. Fearing that Conner might be armed, the officers ordered Conner to come out of the bathroom. When Conner complied with the officers' request and came out of the bathroom, the officers arrested him. Conner was taken to a patrol car outside the motel while Tilton was detained in the motel room. Tilton and Conner were advised of their constitutional rights as required under. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Tilton and Conner both gave statements to the officers. These statements were made voluntarily and after Tilton and Conner were informed of their rights.

The motel room was secured by the officers while Detective Polak sought a search warrant. Detective Iddings stayed at the motel room while a search warrant was being sought. Sergeant Young instructed Detective Iddings to stay at the motel; not to let anyone in the motel room, not to touch anything, and not to conduct a search of the room. Detective Iddings followed these directives and did not conduct a search of the room. The search warrant application signed by Detective Polak contained the following information:

A. Facts of which I have personal knowledge without using an informant.

1. Facts: On 12–25–95 a burglary occurred at 4605 Meadow Lane in which the attached list of property was report-

ly and accurately what he or she saw and observed; and (7) whether the witness's testimony is supported or contradicted by other evidence in the case. *See United States v. Phillips*, 522 F.2d 388, 391 (8th Cir.1975); *see also United States v. Merrival*, 600 F.2d 717, 719 (8th Cir.1979); *Clark v. United States*, 391 F.2d 57, 60 (8th Cir.), *cert. denied*, 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); Manual of Model Jury Instructions for the District Courts of the Eighth Circuit 3.03 (1993). On the morning of January 2, 1996, Wendie Oestmann was staying at the motel with her husband in Room 33. The Oestmanns were staying at the motel because of Mr. Oestmann's business. The Oestmanns' room was two rooms to the north of Room 31. Ms. Oestmann was awakened by the officers' knocking on the door to Room 31 and their shouts. Given the circumstances that led to her awakening, Ms. Oestmann paid keen attention to what was transpiring outside Room 31. Wendie Oestmann had no motive to lie or to provide inaccurate testimony at the hearing. She was neither an acquaintance nor

friend of either Conner or Tilton. Additionally, Ms. Oestmann's testimony on this point is entirely consistent with that portion of Sergeant Young's testimony in which he testified, "I might have said come onto [sic] the door, come and open the door, something to that effect." Tr. at p. 44, 1. 17–19. Although defendant Tilton testified that he heard the police say, "[t]his is the police, open the door now," Tr. at p. 121, 1.22–23, the court need not decide his credibility on this point. The court merely notes that Tilton's testimony is consistent with Ms. Oestmann's and Sergeant Young's initial testimony.

5. Both of the Oestmanns described the officers' knocking as "a heavy knock." Tr. at p. 114. Detective Iddings referred to the officers' actions as "pounding." Tr. at p. 87.

6. Sergeant Young did not recognize Tilton when Tilton opened the motel room door. Sergeant Young, however, was familiar enough with Conner from prior investigations to recognize him.

ed as stolen. On 1–2–96 information was received from the Woodbury County Sheriff's Office that Larry Conner and John Tilton were involved in this burglary and that they were staying at a local motel. They were operating a red 1986 Pontiac Fiero, License/WEH624. The vehicle was located on 1–2–96 parked at the Elmdale Motel parked in front of Room # 31. It was verified that this room was rented to Larry Conner on 12–26–95. Officers knocked on the door and identified themselves and Mr. Tilton opened the door. At that time, in plain view were coin rolls and coin sets throughout the room.

Government Exhibit # AA, Search Warrant Application, p. 3. A search warrant was secured and the room was subsequently searched. The officers seized a Smith & Wesson .38 caliber revolver, a Colt pistol, coins, three large briefcases, and other items believed to have been taken during the Uhlir burglary.

Sergeant Young next obtained a search warrant for Conner's residence in Sloan, Iowa. The application for the second search warrant, signed by Sergeant Young, contained the following information:

A. Facts of which I have personal knowledge without using an informant.

1. Facts: On 12–25–95 a burglary occurred at 4605 Meadow Lane in which approximately $100,000 in coins were taken along with the vehicle and guns listed on page one of the Search Warrant. That, on 1–2–96 Detective Polak received information from Deputy Fox, Woodbury County Sheriff's Department, that an informant called him and indicated that the suspects in this burglary were staying in an unknown motel in Sioux City and were driving a red 1986 Pontiac Fiero, license/WEH624. That, the two suspects have the stolen property in their possession. Informant indicated to Deputy Fox that the suspects were Larry Conner and John Tilton. On 1–2–96 Detectives Monlux and Rohde located the suspect vehicle at the Elmdale Motel, 22nd & Highway 75 North, Sioux City; and the vehicle was parked

in front of Room # 31. That, the clerk of the Elmdale was contacted by detectives and registration information indicated that Larry Conner was renting Room # 31 and gave a home address of 2027 310th Street, Sloan, Iowa. That, this affiant is familiar with the criminal history of Larry Conner and John Tilton. That, this affiant along with Officer Hein knocked on the door to Room # 31 and John Tilton looked out the window. Officers announced their presence and approximately 3 minutes later Tilton opened the door to the room. That, lying on top of the bed I observed coin boxes that resembled those described by the victim of the burglary. After entering the room, I observed several brief cases and numerous packages of coins which also fit the description given by the victim. After securing the room and making application for a search warrant for that room, information was again received from Deputy Fox that more stolen property could be located at 2027 310th Street, Sloan, Iowa. That, this is the residence of Donna and Larry Conner.

Government Exhibit # BB, Search Warrant Application, p. 3. During the search of the Sloan residence, law enforcement officers seized items they believed had also been taken during the Uhlir burglary.

## III. LEGAL ANALYSIS

The Fourth Amendment prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and effects." The protections afforded by the Fourth Amendment provide individuals with a right of privacy which must not be arbitrarily invaded by either the federal government or the states. *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Just days ago, the Supreme Court observed,

We have long held that the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, [1803] 114 L.Ed.2d 297 (1991). Reasonableness, in turn, is mea-

sured in objective terms by examining the totality of the circumstances.

*Ohio v. Robinette,* —— U.S. ——, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (also "emphasizing the fact-specific nature of the reasonableness inquiry").

Any evidence secured through an unreasonable, hence illegal, search and seizure may not be used in a federal prosecution, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), nor may the fruit of such tainted evidence be admitted against the defendant whose privacy rights were originally violated. *Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–18, 9 L.Ed.2d 441 (1963). Because all of the evidence against the defendants for which suppression is sought is alleged to be the fruits of the officers' unconstitutional initial entry, if the defendants prevail, all of the resulting evidence should be suppressed. *See Wong Sun,* 371 U.S. at 484–88, 83 S.Ct. at 415–18; *United States v. Duchi,* 906 F.2d 1278, 1285 (8th Cir.1990); *United States v. Williams,* 604 F.2d 1102 (8th Cir.1979).

Because of the overlap in the issues raised in Conner's and Tilton's motions, the court will proceed by addressing each of the individual issues raised in the motions *seriatim.* These issues fall into three general categories: the standing of the defendants to assert constitutional violations from the entry into and search of the motel room; the constitutionality of the entry into the motel room and the arrest of the defendants; and the constitutionality of the subsequent searches and seizures.

### A. Standing

█ Initially, the court must consider whether defendants Conner and Tilton have standing to object to the search of the motel room. A defendant's Fourth Amendment rights cannot be violated by a search unless he or she has a legitimate expectation of privacy in the area searched. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see United States v. Stallings,* 28 F.3d 58, 60 (8th Cir.1994); *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir.1994). It is clear that Fourth Amendment rights are personal and may not be vicariously asserted.

*United States v. Padilla,* 508 U.S. 77, 81, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993) (noting "that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure."); *see also United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2443–44, 65 L.Ed.2d 468 (1980); *Rakas,* 439 U.S. at 148–49, 99 S.Ct. at 432–33. While an ownership or possessory interest in the premises is not necessarily required, the mere legitimate presence on the searched premises by invitation or otherwise is not sufficient to create a protectable expectation of privacy. *Rakas,* 439 U.S. at 142–43, 99 S.Ct. at 429–30; *United States v. Meyer,* 656 F.2d 979, 981 (5th Cir.1981).

In his motion, Conner contends that Room 31 of the Elmdale Motel was registered in his name and he was residing there. Tilton asserts in his motion and moving papers that, while the room was in Conner's name, he also was residing there. A party seeking to challenge a search of commercial premises bears the burden of establishing a reasonable expectation of privacy. *See Rakas,* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1; *Gomez,* 16 F.3d at 256; *United States v. Acosta,* 965 F.2d 1248, 1256 n. 9 (3d Cir.1992). This burden entails establishing that the challenging party had a subjective expectation of privacy in the searched premises and that the expectation of privacy is one that society is willing to accept. *See Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Stallings,* 28 F.3d at 60; *United States v. Kiser,* 948 F.2d 418, 423 (8th Cir. 1991), *cert. denied,* 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992); *United States v. Monie,* 907 F.2d 793, 794 (8th Cir.1990); *United States v. Chuang,* 897 F.2d 646, 649 (2d Cir.), *cert. denied,* 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). Therefore, the threshold issue here is whether each of the defendants possessed a subjective expectation of privacy in the motel room. Conner and Tilton each bear the burden of proving a legitimate expectation of privacy in the motel room. *See Rawlings v. Kentucky,* 448 U.S. 98, 104–05, 100 S.Ct. 2556, 2561–62, 65

L.Ed.2d 633 (1980); *Rakas,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1; *Stallings,* 28 F.3d at 60; *United States v. Macklin,* 902 F.2d 1320, 1330 (8th Cir.1990), *cert. denied,* 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); *United States v. Fahnbulleh,* 748 F.2d 473, 477 (8th Cir.1984), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2685, 86 L.Ed.2d 702 (1985).

Whether a party has an actual subjective expectation of privacy depends on several factors. Courts have looked to whether the defendant had a possessory interest in the things seized or place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that the place would remain free from governmental intrusion, whether he took normal precautions to maintain his privacy, and whether he was legitimately on the premises. *See United States v. Nabors,* 761 F.2d 465, 469 (8th Cir.) (finding that a casual guest did not have a legitimate privacy interest at a host's home), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985); *United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir.) (finding that the defendant possessed a legitimate expectation of privacy in his parents' home), *corrected on reh'g on other grounds,* 664 F.2d 84 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982); *and compare Gomez,* 16 F.3d at 256 (holding that a defendant did not have a sufficient expectation of privacy in the automobile he was driving).

Here, the government does not challenge Conner's and Tilton's assertions that they were both residing at Room 31 nor that Room 31 was registered in Conner's name. The evidence is uncontested that Tilton had occupancy rights in the Elmdale motel room assigned to Conner. The court concludes that both defendants had subjective expectations of privacy in the motel room, for a number of reasons, all recognized in the *Nabors* decision: (1) each had a possessory interest in the motel room; (2) each had the right to exclude others from that place; (3) each exhibited a subjective expectation that the place would remain free from governmental intrusion by refusing to open the door to police officers, even though the officers had identified themselves as the police, until the defendants were ordered to open the door; (4) the defendants had taken normal precautions to maintain their privacy, such as by keeping the door and curtains to the motel room closed; and (5) each was legitimately on the premises by virtue of having rented the motel room. *See Nabors,* 761 F.2d at 469.

As to the willingness of society to accept the defendants' expectation of privacy, the second prong of the expectation of privacy test, *see, e.g., Smith,* 442 U.S. at 740, 99 S.Ct. at 2580; *Stallings,* 28 F.3d at 60, it is now well-settled that a person does not forfeit Fourth Amendment protection merely because he or she is residing in a hotel room. *See, e.g., Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966) (holding that "[a] hotel room can be the object of Fourth Amendment protection as much as a home or an office."); *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893–94, 11 L.Ed.2d 856 (1964) (holding that the constitutional protections against unreasonable searches and seizures of homes extend to guest rooms in commercial establishments); *United States v. Hardy,* 52 F.3d 147, 149 (7th Cir.) (holding that a motel room occupied as a temporary residence receives the same constitutional protection as a home), *cert. denied,* —— U.S. ——, 116 S.Ct. 207, 133 L.Ed.2d 140 (1995); *United States v. Foxworth,* 8 F.3d 540, 544 (7th Cir.1993) ("The Fourth Amendment protection also applies to warrantless intrusions into motel rooms when occupied as a temporary abode."), *cert. denied,* 511 U.S. 1025, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994); *United States v. Richard,* 994 F.2d 244, 247 (5th Cir.1993) (holding that the Fourth Amendment protections extend to guests staying in hotel rooms); *United States v. Rosario,* 962 F.2d 733, 736 (7th Cir.1992) (holding that the Fourth Amendment's prohibition against unreasonable searches and unreasonable seizures protects "the legitimate privacy expectations of the occupant of a hotel or motel."); *United States v. Rivera,* 825 F.2d 152, 156 (7th Cir.) ("A hotel room, as a temporary abode, is similarly protected from arbitrary searches and seizures."), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492

(1987); *United States v. Diaz*, 814 F.2d 454, 458 (7th Cir.) (holding that the Fourth Amendment protections against illegal search and seizure apply to individuals in hotel rooms as well as in homes), *cert. denied*, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); *United States v. Baldacchino*, 762 F.2d 170, 175–76 (1st Cir.1985) (concluding that a defendant who was a motel room guest "had the same right of privacy that one would have against an intrusion into one's private dwelling."); *United States v. Newbern*, 731 F.2d 744, 748 (11th Cir.1984) (holding that "a person does not forfeit fourth amendment protections merely because he is residing in a hotel room."); *United States v. Roper*, 681 F.2d 1354, 1357 n. 1 (11th Cir. 1982) (holding that the defendant's use of a motel room for lodging "insures the same expectation of privacy as if it were his home."), *cert. denied sub nom. Newton v. United States*, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); *United States v. Bulman*, 667 F.2d 1374, 1383 (11th Cir.) (indicating that "an individual does not forfeit his Fourth Amendment protections merely because he is residing in a hotel room."), *cert. denied sub nom. Howard v. United States*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir.) (holding that while an individual's Fourth Amendment rights "do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish."), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *United States v. Killebrew*, 560 F.2d 729, 733 (6th Cir.1977) (holding that "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures."); *cf. United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir.1994) (holding that a defendant had the same privacy interest in a leased condominium that a person would have in a motel room). *But cf. United States v. Irizarry*, 673 F.2d 554, 556 (1st Cir.1982) (holding that the defendant had failed to generate a privacy interest in a hotel room were he offered no evidence of any personal interest in the hotel room beyond his being "merely present").

Because the defendants have satisfied both prongs of the expectation of privacy test, the court concludes that both Conner and Tilton possessed a reasonable expectation of privacy in Room 31 of the Elmdale Motel. Thus, the court concludes that both Conner and Tilton had legitimate expectations of privacy in the motel room for the purposes of the Fourth Amendment. Consequently, both have standing to challenge the entry into and search of that motel room by law enforcement officers. *Rakas*, 439 U.S. at 128, 99 S.Ct. at 422–23 (a defendant has standing to assert a violation of his or her Fourth Amendment rights when the defendant has a legitimate expectation of privacy in the area searched); *Stallings*, 28 F.3d at 60; *Gomez*, 16 F.3d at 256.

### B. Entry And Arrest

Because both defendants have standing to seek to suppress evidence seized from the motel room, the next questions before the court concern the propriety of the officer's entry into the motel room and their arrest of the defendants. Much depends upon how law enforcement officers gained visual access to the interior of the motel room, because plainly once they gained such access, the likely fruits of crime were in plain view around the motel room, justifying seizure of such items and further search, as well as establishing probable cause for the defendants' arrest. *Cf. United States v. Winsor*, 846 F.2d 1569, 1572 (9th Cir.1988) (en banc) (when a criminal defendant asserted violation of his Fourth Amendment rights, because officers knocked on his hotel room door, the court stated, "The threshold question we must decide is whether the police conducted a search within the purview of the Fourth Amendment when they looked into Winsor's room through the open door while standing in the hotel corridor."). The officers gained visual access to the motel room when Tilton opened the door in response to the officers' knocking. The first fighting issue between the parties, therefore, is whether Tilton voluntarily opened the door to the motel room, that is, whether he consented to opening the door upon the request of law enforcement officers, or whether Tilton involuntarily opened the door in response to a demand for entry under color of authority.

### 1. Did the door open by consent or upon a demand under color of authority?

In *United States v. Peters,* 912 F.2d 208 (8th Cir.1990), *cert. denied,* 498 U.S. 1094, 111 S.Ct. 981, 112 L.Ed.2d 1066 (1991), the Eighth Circuit Court of Appeals was presented with a claim that law enforcement officers violated a defendant's Fourth Amendment rights in knocking on his hotel room door and in looking into his hotel room through the door after he opened it. *Peters,* 912 F.2d at 210. When the law enforcement officers were able to look into the defendant's hotel room, they saw contraband in plain view in the room. *Id.* The Eighth Circuit Court of Appeals observed,

> When an individual voluntarily opens the door of his or her place of residence in response to a simple knock, the individual is knowingly exposing to the public anything that can be seen through that open door and thus is not afforded fourth amendment protection. *United States v. Wright,* 641 F.2d 602, 604 (8th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *see also Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public, even in his or her own home or office, is not a subject of Fourth Amendment protection."). After Peters opened the door to the hotel room in which he was staying in response to the simple knock on the door by the police officers, a search did not occur when the detective looked into Peters' room through the open doorway. Therefore, any contraband in "plain view," here the crack cocaine and the drug paraphernalia, was properly seized by the officers under the plain view doctrine. *See Horton v. California,* [496] U.S. [128], [136–38] 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); *United States v. Garner,* 907 F.2d 60, 62 (8th Cir.1990)[, *cert. denied,* 498 U.S. 1068, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991) ].

*Peters,* 912 F.2d at 210. In a more recent, but very brief opinion, the Eighth Circuit Court of Appeals reaffirmed that opening a door in response to a "simple knock" is consensual and observing objects thus revealed inside in plain view does not violate any constitutional standard requiring suppression of evidence. *See United States v. Deanda,* 73 F.3d 825, 825–26 (8th Cir.1996). In *Deanda,*

> [t]he officers, acting on an anonymous tip, knocked on [the defendant's] door and asked to come in. [The defendant] willingly let them in. The officers did not enter with a display of force or otherwise in a coercive manner. They did not demand or obtain entry under authority of law. They simply knocked on the door and were let in. The evidence at issue was thereafter observed either in plain view or as a result of [the defendant's] consent to search the entire house.

*Deanda,* 73 F.3d at 826.

Similarly, the Ninth Circuit Court of Appeals recently held that a defendant who opened the door in response to a simple knock by police officers could not complain of his warrantless arrest. *United States v. Vaneaton,* 49 F.3d 1423, 1425–27 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996). The court found that the question posed in *Vaneaton* was not "whether [the defendant] was standing inside or outside the threshold of his [motel] room, but whether he 'voluntarily exposed himself to warrantless arrest' by freely opening the door of his motel room to the police." *Id.* at 1426. The court concluded that if the defendant did so expose himself, the presumption of the unreasonableness of a warrantless seizure inside a home created by *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), would be overcome. *Id.* To put it another way, the court found implicit in its prior precedent "approval of a warrantless arrest of a suspect who voluntarily opens the door of his dwelling in response to a noncoercive knock by the police." *Id.* The court thus distinguished prior precedent finding arrests unconstitutional where the door had opened in response to subterfuge to get the defendant to open the door. *Id.* (distinguishing *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), *aff'd,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982)). The court found that

in Vaneaton's case the uniformed police used no force or threats, and unlike *Johnson*, they did not resort to a subterfuge or a ruse, or draw weapons. When Vaneaton saw them through the window, he voluntarily opened the door and exposed both himself and the immediate area to them. No threats or force were used by the police to get him to open the door, and his actions were not taken in response to a claim of lawful authority.

*Vaneaton*, 49 F.3d at 1427. Thus, the court found no invasion of a defendant's dwelling place that *Payton* seeks to protect, declined to find the seizure in the case before it offended the Fourth Amendment, and affirmed the district court's denial of the defendant's motion to suppress. *Id.; accord United States v. Rosario*, 962 F.2d 733, 738 (7th Cir.1992) (contrasting the opening of a door by consent with opening a door "in submission to authority," and finding consent to entry where the occupant of a motel room opened the door in response to an officer's knock, the officer who knocked at the door identified himself when the occupant opened the door, mentioned why police were at the motel, and requested permission to enter the room).

The government asserts, without elaborating its argument, that this case presents only a constitutional "knock and talk" scenario, citing *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Consequently, the government contends, no search or seizure occurred when officers looked into the motel room after Tilton opened the door, and no illegality taints the physical entry into the motel room and the arrest of the defendants. The court notes that *Bostick* is, at best, only remotely related to the issues in this case, because it did not involve a "knock and talk" scenario. Instead, *Bostick* involved officers picking out an individual on a bus, admittedly without articulable suspicion, and asking to inspect his ticket and identification. *Bostick*, 501 U.S. at 431, 111 S.Ct. at 2384–85. The "sole issue presented for [the Court's] review [was] whether a police encounter on a bus of the type described above necessarily constitutes a 'seizure' within the meaning of the Fourth Amendment," *Id.* at 433, 111 S.Ct. at 2386, although the court

considered arguments that the approach of the officers constituted "an *intimidating* show of authority." *Id.* at 438, 111 S.Ct. at 2388. Thus, *Bostick* is at most only marginally instructive.

However, as the Eighth Circuit Court of Appeals seemed to suggest in *Peters* and *Deanda*, and the Ninth Circuit Court of Appeals more explicitly stated in *Vaneaton*, the situation is different when the defendant does not voluntarily respond to a "simple knock on the door." *Deanda*, 73 F.3d at 826; *Peters*, 912 F.2d at 210; *see also Vaneaton*, 49 F.3d at 1427 (suggesting factors that might have made the opening of the door nonconsensual and thus violative of the Fourth Amendment). Instead, courts have held that a defendant does not "voluntarily" open a door, and thus does not consent to public view of things beyond the door, when the defendant complies with a police demand that the occupant of the premises open the door, because such " '[c]ompliance with a police "demand" is not consent.' " *Winsor*, 846 F.2d at 1573 n. 3 (en banc decision quoting the panel decision at 816 F.2d 1394, 1397 (9th Cir.1987)). In *Winsor*, the police decided to enter a hotel and to go from room to room looking for a robbery suspect. *Id.* at 1571. "When the police knocked on the door [of the defendants' room] and demanded that it be opened," one of the defendants obeyed, at which point, the police officers recognized the suspect as the robber and found evidence of the robbery in plain view. *Id.* The Ninth Circuit Court of Appeals found that the defendant had opened the door in response to a claim of lawful authority, not voluntarily. *Winsor*, 846 F.2d at 1573. Consequently, the *Winsor* court held that "the police did effect a 'search' when they gained visual entry into the room through the door that was opened at their command." *Id.*

More recently, the Eleventh Circuit Court of Appeals has also distinguished between physical entry, not just visual entry, obtained by consent and entry obtained when a door is opened "in response to a 'show of official authority.' " *United States v. Tovar–Rico*, 61 F.3d 1529, 1535–36 (11th Cir.1995). In *Tovar–Rico*,

[t]he circumstances of the entry to [the defendant's] apartment [were] summed up by the magistrate judge as follows: "Defendant was first confronted by police officers that day when at least five officers knocked loudly at her door, announced their identity as police officers through the closed door, and requested permission to enter. Defendant then opened the door and the officers entered quickly with guns drawn to do the protective sweep." He concluded that under the circumstances, the defendant did not have any understanding of her right to refuse entry and demand a warrant.

*Tovar–Rico,* 61 F.3d at 1535. After the police officers conducted their "protective sweep," they asked the defendant for consent to another search, to which the defendant agreed by signing a consent form. *Id.* at 1535–36.

The magistrate judge found the consent involuntary. He opined that Tovar had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search. We agree. *We entertain no doubt that Tovar opened the door in response to a "show of official authority" and cannot be deemed to have consented to the agents' entry or to have voluntarily consented to the search. Cf. Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir.1986). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

After a careful review of the uncontradicted facts established in the record, *we conclude that the condition which existed at the time made the entry illegal and support the district court's finding that the consent to search was not voluntary.*

*Tovar–Rico,* 61 F.3d at 1536 (emphasis added). The appellate court therefore affirmed the district court's suppression of evidence gained as the result of the nonconsensual opening of the door into the defendant's home. *Id.* at 1537.

The Ninth and Eleventh Circuit Courts of Appeals are not alone in holding that where a door is opened in response to coercion or a demand under color of authority, the subsequent view of, entry into, or search of the interior thus revealed is not the result of consent or voluntary action by the defendant. *See United States v. Edmondson,* 791 F.2d 1512, 1514–15 (11th Cir.1986) (the defendant's opening of a door following a command of "FBI. Open the door." was deemed not to constitute a voluntary consent to entry; therefore the arrest of the defendant was illegal and the evidence seized at the time of the arrest was unlawfully seized); *United States v. Newbern,* 731 F.2d 744, 748 (11th Cir.1984) (where the police knocked on the defendant's hotel door and the defendant pulled back the curtain of his window to see who was knocking and saw the officers with their badges out and their guns drawn, the court found that "[t]he fact that [defendant] then told the officers to come in, under such circumstances, cannot be termed entry based on consent"; absent consent or exigent circumstances, the entry into the hotel room was an unconstitutional intrusion, and all evidence obtained from the room was suppressed as the product of an illegal arrest); *United States v. Al–Azzawy,* 784 F.2d 890, 893 (9th Cir.1985) (concluding that a defendant did not voluntarily open the door of his residence where the police, with weapons drawn, surrounded the residence and ordered him through a bullhorn to come outside; however, because the arrest was supported by probable cause and exigent circumstances, no evidence was suppressed), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *see also Fontenot v. Cormier,* 56 F.3d 669, 675 (5th Cir.1995) (in an action pursuant to 42 U.S.C. § 1983, the court found that the plaintiff did not implicitly consent to entry by police officers where the plaintiff was abruptly awakened in the middle of the night by bright lights shining through her bedroom window, was confronted by uniformed and armed officers who did not knock or ask if they could enter her

residence, but instead ordered the plaintiff to open the door; the court concluded that the officers were not free to enter the residence absent consent, and the appellate court reversed the district court's entry of judgment as a matter of law in favor of the officers on the plaintiff's § 1983 claim). *But cf. United States v. Tobin,* 923 F.2d 1506, 1512 (11th Cir.1991) (en banc) (when an agent knocked on defendant's door for several minutes as he shouted in English and in Spanish, "I'm a police officer, I would like to talk to you, I need for you to come here," the court concluded that the agent's words were "in the form of a request," and thus the defendant's decision to open the door was voluntary), *cert. denied,* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).

Even the en banc decision of the Eleventh Circuit Court of Appeals in *Tobin,* which both preceded the panel decision in *Tovar–Rico,* and must be contrasted with *Tovar–Rico,* because the court ultimately found that the defendant in the case before it in *Tobin* opened the door voluntarily, nonetheless supports the same rule of law. In *Tobin,* the court also recognized the difference between "cases in which police have used their position to demand entry" and cases in which the defendant voluntarily opened the door in response to a request that he or she do so, citing the same authority relied on by the later panel in *Tovar–Rico. Tobin,* 923 F.2d at 1512 (citing *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968), and *Edmondson,* 791 F.2d at 1514, as examples of the first kind of case, and *United States v. Willis,* 759 F.2d 1486, 1493 & 1498 (11th Cir.), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985), as an example of the second). In the first kind of case, the Eleventh Circuit Court of Appeals en banc recognized that, because the door was opened in response to a demand, the courts "ha[d] held that consent was not voluntary and thus ha[d] required suppression of evidence discovered pursuant to entry." *Id.*

■ The court concludes from these authorities that an unconstitutional "search" occurs, when officers gain visual or physical access to a motel room, even if objects in the interior of a motel room are in plain view when the door is opened, when the door is not opened voluntarily, but is instead opened in response to a demand under color of authority. *See, e.g., Tovar–Rico,* 61 F.3d at 1537 (holding that an unconstitutional entry occurred, because a door was opened in response to a show of authority, when at least five officers knocked loudly at the defendant's door, announced their identity as police officers through the closed door, and requested permission to enter); *Winsor,* 846 F.2d at 1573 (specifically holding that visual entry into a room through a door that was opened at the command of police officers constituted a "search" within the meaning of the Fourth Amendment). Furthermore, any evidence gained as the result of such involuntary access should be suppressed, unless some other constitutionally permissible ground for the access is presented. *See Tovar–Rico,* 61 F.3d at 1537 (affirming suppression of evidence obtained by nonconsensual opening of a door and entry into a home); *Winsor,* 846 F.2d at 1573 (having determined that visual access was a "search," because the access was not gained by consent, the court considered whether probable cause for the search otherwise existed); *see also Tobin,* 923 F.2d at 1512 (recognizing that courts had suppressed evidence where access was gained without the defendant's consent or voluntary action); *Edmondson,* 791 F.2d at 1514–15 (evidence seized at the time of the arrest following entry obtained without consent or exigent circumstances was unlawfully seized); *Newbern,* 731 F.2d at 748 (where the entry into a hotel room was obtained without consent, the entry was an unconstitutional intrusion, and all evidence obtained from the room was suppressed as the product of an illegal arrest); *and compare Al–Azzawy,* 784 F.2d at 893 (9th Cir.1985) (although the defendant did not voluntarily open the door of his residence the arrest was supported by probable cause and exigent circumstances; therefore, no evidence was suppressed). Thus, the constitutionality of the officers' visual and physical access to the interior of the motel room in this case depends upon the voluntariness of Tilton's opening of the motel room door.

The Supreme Court has said,

When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.

*Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The Supreme Court put the matter very succinctly when it added, "Where there is coercion there cannot be consent." *Id.* at 550, 88 S.Ct. at 1792. The Eighth Circuit Court of Appeals has explained further the effect of consent, and articulated the test for how the court is to determine whether consent was given:

A search based upon an individual's consent may be undertaken by law enforcement agents without a warrant or probable cause, and any evidence discovered during the search may be seized and admitted at trial. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973) (*Schneckloth* ). To justify a consensual search, the prosecution has the burden of proving that an individual voluntarily consented to the search. *United States v. Severe,* 29 F.3d 444, 446 (8th Cir.1994) (*Severe* ) (citing *United States v. Larson,* 978 F.2d 1021, 1023 (8th Cir.1992))[, *cert. denied,* —— U.S. ——, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995) ]. The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent. *Schneckloth,* 412 U.S. at 235, 93 S.Ct. at 2051–52. The totality of the circumstances must be considered by the court to determine whether consent was given voluntarily and without coercion. *Severe,* 29 F.3d at 446; *United States v. Barahona,* 990 F.2d 412, 417 (8th Cir.1993) (citing *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048). Consent may be inferred through words, actions or conduct of the individual subject to the search. *United States v. Gleason,* 25 F.3d 605, 607 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 283, 130 L.Ed.2d 199 (1994).

The question of whether consent to search is present is an issue of fact that requires consideration of the totality of the circumstances. *Severe,* 29 F.3d at 446 (citing *United States v. Cortez,* 935 F.2d 135, 142 (8th Cir.1991), *cert. denied,* 502 U.S. 1062, 112 S.Ct. 945, 117 L.Ed.2d 114 (1992)); *see Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048. A district court's finding of consent to search is reviewed under the clearly erroneous standard. *Id.*

*United States v. Heath,* 58 F.3d 1271, 1275–76 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 240, 133 L.Ed.2d 167 (1995). Very recently, the Supreme Court reaffirmed this test of consent:

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), it was argued that ... consent [to a search] could not be valid unless the defendant knew that he had a right to refuse the request. We rejected this argument: "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Id.,* at 227 [93 S.Ct. at 2048]. And just as it "would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning," *id.* at 231 [93 S.Ct. at 2050], so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances," *id.,* at 248–249 [93 S.Ct. at 2059].

*Robinette,* —— U.S. at ——, 117 S.Ct. at 421 (emphasis added).

The court concludes, from the totality of the circumstances, that Tilton involuntarily opened the door to the motel room pursuant to a command of entry under color of authority; thus, Tilton did not consent to the officers' view of anything revealed beyond the door or to entry of the officers into the motel room to make a search or to effect the arrest of the defendants. *Compare Peters,* 912

F.2d at 210 (a defendant who opens a door voluntarily "knowingly expos[es] to the public anything that can be seen through that open door and thus is not afforded fourth amendment protection.").

The circumstances here do not present the "simple knock on the door" of a motel room that the Eighth Circuit Court of Appeals held in *Peters* and *Deanda* violates no constitutional standards. *Id.* Instead, the circumstances here "show[ ] no. more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548–49, 88 S.Ct. at 1792. Although this court agrees with the Ninth Circuit Court of Appeals that police officers "knocking on a door to attempt to contact a·person inside is a common event and hardly a hallmark of a policy state," *Vaneaton*, 49 F.3d at 1427, the law enforcement officers here did more than simply knock on the door to Room 31. The officers knocked on the motel room door in a manner loud and persistent enough to awaken other motel patrons and to alert them to the officers' presence, and the officers announced their identity as police officers through the closed door and at first requested, then demanded, that the door be opened. *Cf. Tovar–Rico*, 61 F.3d at 1535 (entry was gained without consent where officers knocked loudly at the defendant's door, announced their identity as police officers through the closed door, and requested permission to enter). When Tilton pulled back the curtain of his window to see who was· knocking, he saw several officers, albeit only one in uniform.[7] *Cf. Newbern*, 731 F.2d at 748 (the defendant pulled back the curtains in response to knocking by the police and saw officers with their badges out and their guns drawn; the court held that the defendant subsequently opened the door involuntarily). When Tilton did not respond to the initial overtures of the officers, the officers continued to knock. Eventually, Sergeant Young commanded Tilton to "open up" the motel room's door. Only then did Tilton open the door. *Cf. Edmondson*, 791 F.2d at 1514–15 (the defendant opened the door involuntarily when he did so in response to the command, "FBI.

Open the door."). Under such circumstances, Tilton's decision to open the motel room door cannot be construed to be a voluntary one. *See Tovar–Rico*, 61 F.3d at 1537 (an unconstitutional entry and search occurred, because the defendant opened the door in response to a show of authority, where officers knocked loudly at the defendant's door, announced their identity as police officers through the closed door, and requested permission to enter); *Winsor*, 846 F.2d at 1573 (consent was involuntary as matter of law, and officers effected a nonconsensual search of the room, when they knocked on the door of hotel room and commanded that it be opened under a claim of lawful authority). Only involuntariness, not consent, may be inferred from the words, actions, and conduct of the individuals subjected to the search in this case. *Heath*, 58 F.3d at 1275–76 (inferences of consent arise from words, actions, and conduct).

Because Tilton opened the door in response to a show of official authority, and his opening of the door was thus nonconsensual, the officers' visual search of and entry into the motel room was illegal, and the evidence later obtained must be suppressed, *see Tovar–Rico*, 61 F.3d at 1537 (evidence obtained as the result of a nonconsensual entry into a dwelling had to be suppressed); *Winsor*, 846 F.2d. at 1573 (finding evidence gained through a nonconsensual entry into a dwelling would have to be suppressed unless the entry was otherwise constitutionally sanitized); *Edmondson*, 791 F.2d at 1514–15 (suppressing evidence seized at the time of the arrest following entry obtained without consent or exigent circumstances); *Newbern*, 731 F.2d at 748 (suppressing evidence obtained from a nonconsensual entry into a hotel room); *see also Tobin*, 923 F.2d at 1512 (courts have held that evidence obtained when a defendant does not consensually open the door to the premises the defendant occupies, but involuntarily opens the door in response to commands to do so, must be suppressed), unless some other factor sanitizes the search.

---

**7.** From the testimony, the court concludes that Tilton did not see the drawn gun of one of the officers, but it would nonetheless have been readily apparent from what he did see that at least two and possibly more police officers were demanding that he open the door.

## 2. *Probable cause*

The government suggests that other factors do indeed sanitize the searches challenged by the present motions to suppress. The government suggests that the police had probable cause to arrest Tilton and Conner when Detective Iddings spotted the coins on the windowsill to Room 31 and that exigent circumstances justified entering the motel room to effect the defendants' arrests without waiting for a warrant. Therefore, the questions the court must next address are whether the police had probable cause to arrest Conner and Tilton when Detective Iddings saw the coins on the windowsill, and if so, whether the failure of the police officers to obtain an arrest warrant prior to entering the motel room to effect the arrests was contrary to the Supreme Court's holding in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and therefore violative of the Fourth Amendment. The court will address each of these issues in turn.

Probable cause is determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir.1996). "Probable cause exists if 'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense' at the time of the arrest." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir.) (quoting *Hannah v. City of Overland*, 795 F.2d 1385, 1389 (8th Cir.1986)), *cert. denied*, —— U.S. ——, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); *accord Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991); *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964); *United States v. Magness*, 69 F.3d 872, 874 (8th Cir.1995); *United States v. Wallraff*, 705 F.2d 980, 990 (8th Cir.1983). In ascertaining whether probable cause existed, the court must necessarily recognize that probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not

readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. at 2329.

The government concedes that the officers did not have probable cause to arrest Conner and Tilton when the officers arrived at the motel. Tr. at p. 6. However, the government argues that, at the time the police officers gained access to the motel room, the collective knowledge of the officers involved established probable cause to arrest the defendants, because Detective Iddings had obtained the additional information that a box of coins was on the interior windowsill of Room 31 by looking in the window from the sidewalk in front of the room.

### a. *Detective Iddings's observations*

■ Before determining whether Detective Iddings's observations were sufficient to give the officers present at the motel probable cause to arrest Conner and Tilton, the court must first consider whether Detective Iddings's observations themselves violated the Fourth Amendment. Although the court has concluded that Conner and Tilton had a privacy interest in the interior of Room 31, the same cannot be said of the immediate exterior of the motel, including the sidewalk area in front of Room 31. "[T]he Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *see Minnesota v. Olson*, 495 U.S. 91, 97 n. 5, 110 S.Ct. 1684, 1688 n. 5, 109 L.Ed.2d 85 (1990); *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *United States v. Gooch*, 6 F.3d 673, 677 (9th Cir.1993); *United States v. Reed*, 733 F.2d 492, 500 (8th Cir.1984). The Supreme Court has stated that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351, 88 S.Ct. at 511.

Clearly, when a person is in a public place, that person has no legitimate expectation of privacy. The sidewalk area outside Room 31 is just such a public setting in which Conner and Tilton did not have a reasonable expectation of privacy. *See United States v. McGrane*, 746 F.2d 632, 634 (8th Cir.1984) (no expectation of privacy extends to the common areas of an apartment building;

therefore, a visual inspection of storage lockers in the basement did not violate the Fourth Amendment); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir.1977) (holding that a defendant did not have a reasonable expectation of privacy in the hallway of an apartment building); *accord United States v. Clark*, 67 F.3d 1154, 1162 (5th Cir.1995) (a tenant has no reasonable expectation of privacy in a common stairs, walkway, or breezeway of an apartment building), *cert. denied*, — U.S. —, 116 S.Ct. 1432, 134 L.Ed.2d 554 (1996); *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir.1994) (motel guests had no reasonable expectation of privacy in a parking lot, even though part of the lot was reserved for motel guests); *United States v. Nohara*, 3 F.3d 1239, 1241 (9th Cir.1993) (holding that a tenant had no reasonable expectation of privacy in a hallway of a high security apartment building); *United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir.1992) (holding that a defendant had no reasonable expectation of privacy in an apartment building hallway); *United States v. Boden*, 854 F.2d 983 (7th Cir.1988) (a tenant had no expectation of privacy in the common areas of the building, including a storage area); *United States v. Holland*, 755 F.2d 253 (2d Cir.) (the halls and lobbies of a multi-tenant building are not subject to any tenant's expectation of privacy, even when they are guarded by locked doors), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985); *United States v. Dickens*, 695 F.2d 765, 778 (3d Cir.1982) (a person has no reasonable expectation of privacy in a staircase accessible to other tenants of the building), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983); *United States v. Acevedo*, 627 F.2d 68, 69 n. 1 (7th Cir.) (there was no reasonable expectation of privacy in an open gangway between a tavern and a multi-unit dwelling, and the tenant of one dwelling unit had no expectation of privacy in the interior of the dwelling where persons on the gangway, including a police officer, could look through a hole in contact paper on the inside of a window of the dwelling), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1981); *United States v. Penco*, 612 F.2d 19 (2d Cir.1979) (the expectation of privacy does not extend to the lobby of an apartment building, a hallway that should have been locked, but wasn't, or the hallway outside an apartment door); *United States v. Shima*, 545 F.2d 1026 (5th Cir.) (when officers on a public walkway in front of an apartment looked through an apartment window and observed possible contraband, a warrantless search was justified where the occupant had been alerted to the presence of the officers and there was consequently a possibility evidence would be destroyed), *aff'd en banc*, 560 F.2d 1287 (5th Cir.), *cert. denied*, 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 490 (1977); *United States v. Calhoun*, 542 F.2d 1094, 1100 (9th Cir.1976) (the hallway of an apartment or the threshold of a dwelling is a "public" place for purposes of the Fourth Amendment), *cert. denied sub nom. Stephenson v. United States*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977).

Similarly, Officer Iddings's observations from the sidewalk area did not implicate the defendants' Fourth Amendment interests. *Katz*, 389 U.S. at 351, 88 S.Ct. at 511 ("What a person knowingly exposes to the public, even in his or her own home or office, is not a subject of Fourth Amendment protection."). From his position outside the motel room, Officer Iddings observed packages of coins between the room's curtains and window. These coin packages were in plain view from the public walkway in front of the motel room. As the United States Supreme Court has recognized, "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990) (citing *Arizona v. Hicks*, 480 U.S. 321, 325, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987), and *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983)). Thus, unlike the view of possible contraband through the involuntarily opened door of the motel room, the court concludes that Officer Iddings's observation of the coin packages in the motel room windowsill area did not violate Conner's or Tilton's Fourth Amendment rights. *See Horton*, 496 U.S. at 134 n. 5, 110 S.Ct. at 2306 n. 5 (a law enforcement officer's "mere observation" of an object left in plain view does not implicate the Fourth Amendment); *Arizona v. Hicks*,

480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987) (merely viewing an object in plain view is not a "search" within the meaning of the Fourth Amendment); *Texas v. Brown,* 460 U.S. 730, 738 n. 4, 103 S.Ct. 1535, 1541 n. 4, 75 L.Ed.2d 502 (1983) (plurality opinion by Rehnquist, J.) (an item seen in plain view does not involve a Fourth Amendment search); *see also United States v. Bellina,* 665 F.2d 1335, 1341–42 (4th Cir.1981) (a person has no legitimate expectation of privacy within the meaning of the Fourth Amendment when an object is exposed to plain view, even in a person's own home).

Although Detective Iddings's observations did not violate the Fourth Amendment, the critical question here is whether those observations provided probable cause for the officers' entry into the motel room to arrest the defendants. Whether Detective Iddings's observations contributed to or established probable cause to arrest Conner and Tilton depends upon the contribution of those observations to the collective knowledge of the officers present.

### b. Collective knowledge

■ The Eighth Circuit Court of Appeals has said,

> Because probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication, *see United States v. Rich,* 795 F.2d 680, 682 (8th Cir.1986); *United States v. Briley,* 726 F.2d 1301, 1305 (8th Cir.1984), [an arresting officer's] lack of first-hand knowledge is irrelevant.

*United States v. Horne,* 4 F.3d 579, 585–86 (8th Cir.1993), *cert. denied,* 510 U.S. 1138, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994). The Eighth Circuit Court of Appeals has frequently stated this rule that collective knowledge of the officers present, not just an arresting officer's first-hand knowledge, may establish probable cause for an arrest without mentioning the caveat, mentioned in *Horne,* of "some degree of communication" among the officers. *See, e.g., United States v. Morgan,* 997 F.2d 433, 435 (8th Cir.1993) (in making a determination of probable cause, "the court may consider the collective knowledge of all officers involved."); *United States v. Wilson,* 964 F.2d 807, 809 (8th Cir.1992) ("Probable cause exists to make a warrantless arrest when 'at the moment of the arrest, the collective knowledge of the officers involved, was "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense," ' " quoting *United States v. Wajda,* 810 F.2d 754, 758 (8th Cir.), *cert. denied,* 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987), in turn quoting *Beck,* 379 U.S. at 91, 85 S.Ct. at 225–26); *United States v. Abadia,* 949 F.2d 956, 959 (8th Cir.1991) (also quoting *Wajda* and *Beck* ), *cert. denied,* 503 U.S. 949, 112 S.Ct. 1510, 117 L.Ed.2d 648 (1992); *United States v. Riley,* 927 F.2d 1045, 1049 (8th Cir.1991) (the arresting officer could act on the collective knowledge gained from officers in another city's police department to find probable cause); *Wajda,* 810 F.2d at 758 (stating the rule without any caveat concerning communication among the officers); *United States v. Rich,* 795 F.2d 680, 682 (8th Cir.1986) ("the court does not merely look to the actual knowledge of the arresting officer, but to the combined knowledge of all of the officers involved."); *United States v. Briley,* 726 F.2d 1301, 1305 (8th Cir.1984) ("Probable cause is based on the collective knowledge of all the officers involved."); *United States v. Rose,* 541 F.2d 750, 756 (8th Cir.1976) ("The court looks to the collective knowledge and information of all of the officers involved."), *cert. denied,* 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977). Nonetheless, the Eighth Circuit Court of Appeals has suggested that communication is an important basis for application of the "collective knowledge" rule. *See Morgan,* 997 F.2d at 435 (discussing the extent to which the arresting officer had been advised by another investigating officer of facts that, coupled with the arresting officer's own observations at the place and time of arrest, established probable cause); *Riley,* 927 F.2d at 1049 (collective knowledge could be invoked where the arresting officer's first-hand knowledge was coupled with information supplied by officers in another city).

Other courts have expressly held that communication among the officers was essential

to application of the "collective knowledge" rule. Thus, in *United States v. Shareef*, 100 F.3d 1491 (10th Cir.1996), a case not available to the parties when they briefed their arguments, the Tenth Circuit Court of Appeals wrote, "The cases in which we have applied the 'collective knowledge' rule all have involved actual communication to the arresting officer of either facts or a conclusion constituting probable cause, or an arrest order." *Shareef*, 100 F.3d at 1503 (citing *United States v. Maestas*, 2 F.3d 1485, 1493 (10th Cir.1993) (roving agents communicated facts to a fixed checkpoint, and the information collected by all agents could be pooled "to establish the requisite quantum of suspicion"); *United States v. Matthews*, 615 F.2d 1279, 1284 n. 5 (10th Cir.1980) (information collected by several officers was considered in determining probable cause, because officers "shared the various pieces of information with each other"); *United States v. Goeltz*, 513 F.2d 193, 197 (10th Cir.) (finding probable cause based on collective knowledge of officers on the scene where each officer "communicated his observations to his associates"), *cert. denied*, 423 U.S. 830, 96 S.Ct. 51, 46 L.Ed.2d 48 (1975); *Wood v. Crouse*, 436 F.2d 1077 (10th Cir.) (an arresting officer may rely on a sheriff's arrest order where the sheriff has probable cause), *cert. denied sub nom. Wood v. Gaffney*, 402 U.S. 1010, 91 S.Ct. 2193, 29 L.Ed.2d 432 (1971)). However, in *Shareef*, the district court had found that the investigating officer had not communicated the defendant's height and weight to the arresting officer. *Id.* at 1503–05. The Tenth Circuit Court of Appeals recognized that some circuits had allowed the knowledge of officers working closely together on a scene to be mutually imputed without requiring proof of actual communication, and sometimes even where the pertinent facts were found not to have been communicated. *Id.* (citing, *inter alia, United States v. Edwards*, 885 F.2d 377, 383 (7th Cir.1989), and *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir.1989)). Although the Tenth Circuit Court of Appeals recognized the "value" of imputing knowledge among officers working closely together as reflecting what has actually taken place, including subtle, non-verbal communication during the exigencies of an arrest or stop, in the case before it, the court found the presumption had been rebutted, "because the district court found that in fact the information had not been shared." *Id.* The court stated that it might be willing to "aggregate" the collective knowledge of officers working closely together at the scene where each has observed suspicious circumstances that the other has not observed to determine whether the officers behaved reasonably, even absent communication between them, but that it was not willing to do so in the case before it where "neither officer knew the significance of the information, and the information could contribute to neither officer's suspicion of the suspect." *Id.* The court therefore declined to attribute one officer's knowledge of the suspect's height and weight to the other, but otherwise found probable cause for the arrest based on individual knowledge of the arresting officer. *Id.*

This court finds that the rule concerning the need for communication among the officers in order to invoke the "collective knowledge" rule is somewhat confused in some circuits. *See, e.g., United States v. Butler*, 74 F.3d 916, 921 (9th Cir.1996) (stating, "Probable cause can also be demonstrated through the collective knowledge of police officers involved in an investigation, even if some of the information known to other officers is not communicated to the arresting officer," citing *United States v. Bernard*, 607 F.2d 1257, 1267 (9th Cir.1979), and finding the arresting officer did not receive another officer's crime report prior to arresting the defendant, although he had heard a summary of the facts in the crime report during roll call; the court held the arresting officer had probable cause, because the facts learned in roll call plus those resulting from his independent investigation sufficed to establish probable cause), *cert. denied*, —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 308 (1996); *United States v. Bernard*, 607 F.2d 1257, 1267 (9th Cir.1979) (finding communication of information from one officer to another is not required, "particularly where ... the agents were working in close concert," and suggesting that the "knowledge of one officer is the knowledge of all."); *and compare United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir.1994) (stating the rule as " '[w]hen there has been commu-

nication among agents, probable cause can rest upon the investigating agents' "collective knowledge," " " quoting *United States v. Del Vizo,* 918 F.2d 821, 826 (9th Cir.1990), and holding that the collective knowledge and experience of the officers who all conducted surveillance of a parked truck over several days and some of whom observed movement of the truck to another location and unloading of the truck to a "load car," then followed the truck and arrested the drivers, and found cocaine in the truck, was sufficient to uphold a finding of probable cause by some officers to arrest the defendant when he came to collect the "load car"). Courts have sometimes appeared willing to indulge a presumption of communication where operations involving several officers are conducted via a command post, or otherwise to impute knowledge among officers working closely together, even while stating the rule as requiring "at least minimal communication" among the officers. *See United States v. Nafzger,* 974 F.2d 906, 914 (7th Cir.1992) ("Both Marquardt and the briefing officers were part of a coordinated investigation, and all were in close communication with the same command post, the investigation's information center. Thus, since Marquardt had grounds to suspect Roy and this suspicion was presumably relayed, via the command post, to the briefing officials, who then relayed it to Argue, his stop of the defendant did not violate the Fourth Amendment," citing *United States v. Wilson,* 894 F.2d 1245, 1254 (11th Cir.), *cert. denied sub nom. Levine v. United States,* 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990), as stating that the "collective knowledge" rule requires "at least minimal communication between [officers]," and also citing cases imputing the knowledge of officers working together on the same scene and in communication with each other).[8] The Fifth Circuit Court of Appeals has applied a "laminated total" version of the rule, where the

arresting officer has personal knowledge of facts which, standing alone, do not establish probable cause, but, when added to information known to other officers with whom the arresting officer is in communication, "tip the balance in favor of the arrest." *United States v. Kye Soo Lee,* 962 F.2d 430, 436 (5th Cir.1992).

Whatever the merits of imputing or presuming communication among officers working together in order to invoke the "collective knowledge" rule, like the Tenth Circuit Court of Appeals in *Shareef,* 100 F.3d at 1503–05, this court specifically finds that Detective Iddings's observations were *not* communicated to other officers. When Detective Iddings noticed the packages of coins on the windowsill between Room 31's curtains and window, he motioned to them, but Sergeant Young did *not* notice Iddings's gesture nor the coins on the windowsill. Furthermore, Detective Iddings did not tell other officers on the scene that he had seen the coins or take any other action to draw the coins to their attention. Thus, Detective Iddings's observations were not pooled into the "collective knowledge" of the arresting officers.

However, the court must also consider whether Detective Iddings, who alone observed the coins on the windowsill, possessed sufficient second-hand information communicated to him by other officers with whom he was working that, coupled with his own uncommunicated observations, gave *him* probable cause to arrest Tilton and Conner. In other words, the court finds that only Detective Iddings, of all the officers present at the motel, could possibly have had sufficient "collective knowledge" to establish probable cause to arrest Conner and Tilton. On January 2, 1996, the officers had been informed that two men had been involved the Uhlir burglary, Conner and Tilton. They also

---

8. In a civil commitment case, in which commitment also depends upon probable cause being apparent from the petition and certificates of psychiatrists, the court held that the rule requiring "at least minimal communication" was inapplicable, because there was no indication that the psychiatrists who signed certificates had read the petitions. *Villanova v. Abrams,* 972 F.2d 792, 798–99 (7th Cir.1992). However, the court found that a civil commitment was not an arrest,

and as long as the "two halves of the ticket" were presented to the court, and the two halves provided probable cause, the commitment was proper. *Id.* at 799. However, the court opined that "it is true that what an arresting officer does not know is inadmissible to show that he had probable cause for the arrest—otherwise hindsight would validate every arrest of a person who turned out to be a criminal." *Id.*

knew that Conner and Tilton were supposed to be staying at a motel or hotel in Sioux City and were supposed to be driving a red Pontiac Fiero with Iowa license plate WEH624. In addition, the officers knew that Conner and Tilton were supposed to have the coins with them at the motel room. The officers located the red Fiero at the Elmdale motel in front of Room 31. What is unclear from the record is how much of this information was communicated to Detective Iddings when he became involved in the investigation. As the court stated in its findings of fact, although Detective Iddings was assisting the other officers at the motel, he had not previously been involved in the investigation of the Uhlir burglary. As a result, until that morning, Iddings was unfamiliar with the property taken during the Uhlir burglary. Detective Polak informed Detective Iddings that morning that a coin collection had been taken in the burglary and that the car driven by suspects in the burglary had been located at the motel. Although the precise scope or detail of the information conveyed to Detective Iddings is unclear, he apparently had at least a summary of the facts known to all officers at the motel. *Cf. Bernard,* 607 F.2d at 1267 (probable cause was found where the arresting officer acted on his own observation coupled with a summary of facts in a crime report communicated to him at roll call).

The probable cause determination here is an extremely close question. At the time the officers knocked on the door to Room 31, they apparently did so solely because the red Fiero was parked directly in front of that room, although none of the officers had ascertained whether either Tilton or Conners had rented Room 31. The record also does not disclose that the police had linked either Tilton or Conner to the red Fiero parked in front of Room 31. If the police had garnered such information, their probable cause argument would be considerably stronger. Absent such information, which might establish a nexus between Tilton or Conner and the location where the apparent proceeds of the burglary were found by Detective Iddings, however, probable cause probably did not exist for the arrest of the defendants, even with Detective Iddings's observations.

Furthermore, it is apparent from the portions of the record that are clear that the arresting officers had every intention of arresting whoever they found inside the motel room when they demanded that the door be opened, regardless of the fact that none of the other officers present had been advised of Detective Iddings's observations of the coins on the windowsill, and despite the fact that the government concedes that the officers did *not* have probable cause when they arrived at the motel. It is thus apparent to the court that the officers disregarded the probable cause requirement when making their decision to demand entry into the motel room. Ultimately, however, the court need not make, nor rest upon if it were to make, a conclusion that the arresting officers lacked probable cause, because, assuming that probable case existed for the arrest of whoever was in the motel room when the police knocked on the motel room door, the court finds other patent constitutional infirmities undermine the officers' entry into the motel room and arrest of the occupants.

### 3. Warrantless entry and arrest

At the time Tilton and Conner were arrested, the police had not obtained an arrest warrant to do so. The defendants assert that the police officers' failure to obtain an arrest warrant prior to entering the motel room and arresting them was contrary to the holding of the United States Supreme Court in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and therefore violated the Fourth Amendment. Thus, the question the court must decide next is whether the police conduct in arresting the defendants within the motel room violated *Payton* and its progeny.

#### a. The Payton decision

In *Payton,* police officers without any warrant entered a suspect's home in order to arrest him. *Payton,* 445 U.S. at 576, 100 S.Ct. at 1374–75. The Supreme Court invalidated the arrest and held that the Fourth Amendment prohibits police officers from making warrantless and nonconsensual entries into suspects' homes to make routine

felony arrests. *Id.* at 589–90, 100 S.Ct. at 1381–82. Thus, in *Payton,* the Supreme Court drew a bright line at the door of a suspect's residence and declared that the line cannot be crossed to arrest a suspect inside his or her residence, absent consent or exigent circumstances:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." ... In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Id.* (citations omitted); *United States v. Vance,* 53 F.3d 220, 221 (8th Cir.1995) (" '[T]he Fourth Amendment has drawn a firm line at the entrance to the house,' " quoting *Payton* ).

In *Payton,* the Court declared that "[p]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," therefore, "an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and sanctity of the home, and justify the same level of constitutional protection." *Id.* at 588, 100 S.Ct. at 1381; *see also Mahlberg v. Mentzer,* 968 F.2d 772, 775 (8th Cir.) (quoting these statements from *Payton,* and finding that a search warrant adequately protected a defendant's personal privacy interests, thus validating a warrantless arrest in the defendant's home during execution of the search warrant upon discovery of probable cause for the arrest), *cert. denied,* 506 U.S. 1026, 113 S.Ct. 670, 121 L.Ed.2d 593 (1992). Thus, the

result of Payton is that "seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586, 100 S.Ct. at 1380. Indeed, the Eighth Circuit Court of Appeals has stated the rule established by the *Payton* decision to be that "[p]olice officers may not enter or search a home without a warrant unless justified by exigent circumstances." *United States v. Ball,* 90 F.3d 260, 263 (8th Cir.1996); *Vance,* 53 F.3d at 222 ("Law enforcement officials may not cross th[e] line [drawn by *Payton* ] without a search warrant or exigent circumstances."); *United States v. Johnson,* 12 F.3d 760, 764 (8th Cir.1993) ("Police officers may not enter or search a home without a warrant, absent exigent circumstances," citing *Payton, cert. denied,* —— U.S. ——, 114 S.Ct. 2689, 129 L.Ed.2d 821 (1994); *Duchi,* 906 F.2d at 1282. As the Ninth Circuit Court of Appeals has observed, "The purpose of this rule is manifest from the rule itself: to protect an individual's 'zone of privacy.' " *Vaneaton,* 49 F.3d at 1425. Furthermore, "[t]he exigent-circumstances requirement applies even when ... probable cause for the arrests clearly exists." *Duchi,* 906 F.2d at 1282. In this case, however, the court has serious doubts that probable cause existed; thus, it is abundantly clear that failure to meet the exigent circumstances requirement will be fatal to the constitutionality of the arrests and seizures.

In *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the Court reiterated the *Payton* holding, finding that an admittedly nonconsensual warrantless entry and arrest of the defendant in his home violated the Fourth Amendment. *Id.* at 17, 110 S.Ct. at 1642–43. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Court extended the holding in *Payton* to a house guest who had a legitimate expectation of privacy in the host's home.[9] *Id.* at 98–100, 110 S.Ct. at 1688–90.

9. As the court earlier noted, it is now well settled that Fourth Amendment protections apply to the registered occupant of a hotel or motel room. *See Hoffa,* 385 U.S. at 301, 87 S.Ct. at 413; *Stoner,* 376 U.S. at 490, 84 S.Ct. at 893–94; *Hardy,* 52 F.3d at 149; *Foxworth,* 8 F.3d at 544; *Richard,* 994 F.2d at 247; *Rosario,* 962 F.2d at

736; *Rivera,* 825 F.2d at 156; *Diaz,* 814 F.2d at 458; *Baldacchino,* 762 F.2d at 175–76; *Newbern,* 731 F.2d at 748; *Roper,* 681 F.2d at 1357 n. 1; *Bulman,* 667 F.2d at 1383; *Jackson,* 588 F.2d at 1052. Thus, although *Payton* dealt with a warrantless arrest in the defendant's own home, the Fourth Amendment protections articulated in

Therefore, any analysis of whether police officers have violated the Fourth Amendment by engaging in a warrantless arrest or search in the defendants' temporary dwelling must be guided by *Payton.*

It is the defendants' contention that the warrantless entry into the motel room and their warrantless arrests in this case were unconstitutional under *Payton.* The government's response to the defendants' claim is that the warrantless entry and arrests in this case were justified by exigent circumstances. Where a warrantless entry violates the Fourth Amendment standards stated in *Payton,* the court must suppress all evidence tainted by the illegal entry. *Johnson,* 12 F.3d at 765. On the other hand, where exigent circumstances justify the warrantless entry into a dwelling, the entry is constitutional, and items of contraband inside that are in plain view may be seized and may form the basis for a further search warrant. *Vance,* 53 F.3d at 222. Therefore, the court must turn its attention to what constitutes exigent circumstances under *Payton.*

### b. The exigent circumstances exception to the Payton rule

As the court noted above, under *Payton,* seizures inside a residence without a warrant are presumptively unreasonable, absent con-sent or exigent circumstances. *Payton,* 445 U.S. at 582, 100 S.Ct. at 1377–78; *accord Ball,* 90 F.3d at 263; *Vance,* 53 F.3d at 222; *Johnson,* 12 F.3d at 764; *Duchi,* 906 F.2d at 1282. This court has already concluded, in section III.B.1., that there was no consent to entry in this case. However, under the "exigent circumstances" exception, "the warrant requirement is suspended 'when—in the press of circumstances beyond a police officer's control—lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.'" *Johnson,* 12 F.3d at 764 (quoting *Duchi,* 906 F.2d at 1282, in turn citing *United States v. Clement,* 854 F.2d 1116, 1119 (8th Cir.1988)); *see also Ball,* 90 F.3d at 263 (also stating that the "exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed," citing *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978); *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *Ker v. California,* 374 U.S. 23, 42, 83 S.Ct. 1623, 1634–35, 10 L.Ed.2d 726 (1963); *United States v. Clement,* 854 F.2d 1116, 1119 (8th Cir.1988)); *United States v. Parris,* 17 F.3d 227, 229 (8th Cir.) ("Where, in circumstances beyond the officers' control, lives are threatened, a suspect's escape is probable, or evidence is

---

*Payton* against warrantless arrests apply with equal vigor to the registered occupants of a hotel or motel room. *See United States v. Rambo,* 789 F.2d 1289, 1295 (8th Cir.1986) (holding that "[w]e do not doubt that the protections against warrantless intrusions into the home announced in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), apply with equal force to a properly rented hotel room during the rental period."); *accord Vaneaton,* 49 F.3d at 1425 (finding that *Payton* did not bar the arrest of the defendant where the defendant voluntarily exposed himself to warrantless arrest by freely opening the door of a motel room to the police); *United States v. Wicks,* 995 F.2d 964, 969 (10th Cir.) (holding that "[a] motel room may be considered a 'dwelling' for purposes of the validity of a warrantless arrest."), *cert. denied,* 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993); *Richard,* 994 F.2d at 247 (applying *Payton* to a warrantless search of a motel room); *United States v. Rengifo,* 858 F.2d 800, 805 (1st Cir. 1988) (concluding that *Payton* is applicable to a motel room), *cert. denied,* 490 U.S. 1023, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1989); *Diaz,* 814 F.2d at 458 (holding that "[w]e do not believe that *Payton* altered the recognition that '[a] hotel room can be the object of Fourth Amendment protection as much as a home or an office.'"); *Baldacchino,* 762 F.2d at 175–76 (applying *Payton* to a warrantless arrest of a defendant in a motel room); *Roper,* 681 F.2d at 1357 n. 1 (finding that the *Payton* rationale could not "be avoided by an instruction that the defendant is surrounded by armed agents and should come out of his room 'for his own safety.'"); *United States v. Bulman,* 667 F.2d at 1384 (holding that "absent some applicable exception to the warrant requirement of *Payton,* the warrantless invasion of the motel room by law enforcement officials violated [defendant's] Fourth Amendment rights."); *United States v. Killebrew,* 560 F.2d 729, 733 (6th Cir.1977) (holding that "[i]t is beyond dispute that the warrant requirements of the fourth amendment have application to searches of motel and hotel rooms as well as private homes."); *United States v. Ostin,* 858 F.Supp. 1075, 1077–78 (E.D.Wash.1994) (concluding that *Payton* was applicable to a nonconsensual entry into a motel room to effect a warrantless arrest).

about to be destroyed, immediate police action is justified without a warrant," also citing *Tyler,* 436 U.S. at 509, 98 S.Ct. at 1949–50, and *Duchi,* 906 F.2d at 1282), *cert. denied,* 511 U.S. 1077, 114 S.Ct. 1662, 128 L.Ed.2d 378 (1994); *Duchi,* 906 F.2d at 1282.

The Eighth Circuit Court of Appeals has held that a finding of exigent circumstances is a finding of fact reviewed for clear error. *United States v. Parris,* 17 F.3d 227, 229 (8th Cir.1994), *cert. denied,* 511 U.S. 1077, 114 S.Ct. 1662, 128 L.Ed.2d 378 (1994). The government bears the burden of establishing that exigent circumstances existed. *Id.* at 229; *Clement,* 854 F.2d at 1119. In *Ball,* the Eighth Circuit Court of Appeals observed, "The exigent circumstances exception to the warrant requirement is narrowly drawn." *Ball,* 90 F.3d at 263. However, other decisions establish a more extensive list, overlapping or clarifying the general categories identified in *Ball, Parris, Johnson,* and *Duchi,* for categories of circumstances in which a warrantless entry of a private residence may pass constitutional muster: (1) "hot pursuit" of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to the suspect himself or herself. *See Olson,* 495 U.S. at 100, 110 S.Ct. at 1689–90; *see also McCabe v. Life–Line Ambulance Serv., Inc.,* 77 F.3d 540, 545 (1st Cir.), *cert. denied sub nom. McCabe v. City of Lynn,* —— U.S. ——, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996); *United States v. Wihbey,* 75 F.3d 761, 766 (1st Cir.1996); *United States v. Tibolt,* 72 F.3d 965, 969 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996); *Hegarty v. Somerset County,* 53 F.3d 1367, 1374 (1st Cir.), *cert. denied sub nom. Hegarty v. Wright,* —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995).

An exigency must be assessed in light of the totality of the circumstances. *Wihbey,* 75 F.3d at 765; *United States v. Veillette,* 778 F.2d 899, 902 (1st Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). In ascertaining whether an exigency justifies a warrantless search and seizure, the First Circuit Court of Appeals, like other courts, has stated that "the test is 'whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.' " *Wihbey,* 75 F.3d 761, 765 (1st Cir.1996) (quoting *United States v. Wilson,* 36 F.3d 205, 209 (1st Cir.1994) (quoting in turn *United States v. Adams,* 621 F.2d 41, 44 (1st Cir.1980))); *see also United States v. Hardy,* 52 F.3d 147, 149 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 207, 133 L.Ed.2d 140 (1995) ("Exigent circumstances exist when there is a reasonable belief by police that their safety, or the safety of the public, may be threatened."); *United States v. Wilson,* 36 F.3d 205, 209 (1st Cir.1994) (exigent circumstances exist where law enforcement officers confront a "compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant," also citing *Adams,* 621 F.2d at 44); *United States v. Almonte,* 952 F.2d 20, 22 (1st Cir.1991), *cert. denied,* 503 U.S. 1010, 112 S.Ct. 1776, 118 L.Ed.2d 434 (1992); *accord United States v. Saadeh,* 61 F.3d 510, 516 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995); *Mason v. Godinez,* 47 F.3d 852, 855 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 125, 133 L.Ed.2d 74 (1995). Exigency determinations are fact-intensive and thus must be made on a case-by-case basis. *Wihbey,* 75 F.3d at 765; *United States v. Donlin,* 982 F.2d 31, 34 (1st Cir.1992). The critical time for determining whether an exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant." *United States v. Morgan,* 743 F.2d 1158, 1162 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).

The "exigent circumstances" inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the arrest. *See Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990); *Tibolt,* 72 F.3d at 969. The Eighth Circuit Court of Appeals has observed that "[t]he question ... is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin,* 27 F.3d 1346,

1353 (8th Cir.1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987)). Similarly, some time ago, the Eighth Circuit Court of Appeals also wrote, "In applying the exigent circumstances doctrine, the burden is on the [government] to show the entry is within the exception, and an objective standard is used to evaluate the reasonableness of the officer's belief that exigent circumstances existed." *United States v. Selberg*, 630 F.2d 1292, 1295 (8th Cir.1980); *accord Saadeh*, 61 F.3d at 516 (the government bears the burden of proving that " 'its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry into the defendant's [premises],' " quoting *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir.1994)); *United States v. Tarazon*, 989 F.2d 1045, 1049 (9th Cir.), *cert. denied*, 510 U.S. 853, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993); *United States v. Suarez*, 902 F.2d 1466, 1467 (9th Cir.1990). The Eighth Circuit Court of Appeals has also held that " 'an important factor to be considered in the exigent circumstances calculus' " is the seriousness of the offense. *Ball*, 90 F.3d at 263 (quoting *Clement*, 854 F.2d at 1120, in turn quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984)); *Greiner*, 27 F.3d at 1353 (rejecting a misdemeanor offense as sufficient to justify a warrantless entry into a home, because "the gravity of the offense for which a person is arrested has a crucial bearing on whether circumstances were exigent enough to justify a warrantless home arrest," citing *Welsh*, 466 U.S. at 753, 104 S.Ct. at 2099).

The government cannot justify a search on the basis of exigent circumstances that are of the law enforcement officer's own making. *See Johnson*, 12 F.3d 760, 764; *Duchi*, 906 F.2d at 1282; *accord United States v. Panitz*, 907 F.2d 1267, 1270 (1st Cir.1990); *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983); *United States v. Scheffer*, 463 F.2d 567 (5th Cir.), *cert. denied sub nom. Stecher v. United States*, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972); *see also United States v. Hare*, 589 F.2d 1291, 1294 (6th Cir.1979); *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974); *United States v. Curran*, 498 F.2d 30, 34 (9th Cir.1974). As the Eighth Circuit cogently point out in *Duchi*, however,

This general holding will not dispose of this case or, in fact, of many cases. For in some sense the police always create the exigent circumstances that justify warrantless entries and arrests. Their discovery of the criminal causes him to flee; their discovery of the contraband causes the criminal's attempt to destroy or divert the evidence. For the claim of exigent circumstances to be adequately evaluated, the better question to ask is: how did those urgent circumstances come about? This antecedent inquiry—into the reasonableness and propriety of the investigative tactics that generated the exigency—seems to be what courts have in fact been doing in these kinds of cases.

*Duchi*, 906 F.2d at 1282. Thus, in *Ball*, the Eighth Circuit Court of Appeals rejected the defendants' argument that the police created the exigent circumstances by approaching the porch of a house and that they could have avoided the warrantless entry by stationing an officer at the back door of the house. *Ball*, 90 F.3d at 264. The court found that this argument was based "primarily on hindsight," because, from the standpoint of the officers, who were in the early stages of their investigation and had only begun their surveillance, it was unreasonable for them to anticipate the events that ensued, which included the flight of persons apparently conducting a drug transaction and holding weapons, into the residence. *Id.* In determining whether the police manufactured the exigent circumstances, the court must "first examine[ ] the reasonableness and propriety of the investigative tactics that generated the urgent situation," *Johnson*, 12 F.3d at 764 (citing *Duchi*, 906 F.2d at 1284), although the ultimate question is how did the urgent circumstances come about. *Duchi*, 906 F.2d at 1284. If the heightened danger that evidence would be destroyed, lives threatened, or an escape would occur was the probable result of the officers' conduct, the officers' conduct created the danger, and the exigent circumstances resulting from that conduct cannot justify the officers' warrantless entry. *Cf. Johnson*, 12 F.3d at 764 (considering only

the danger of destruction of evidence from removal and replacement of drugs in a package identified by postal inspectors before forwarding the package to the suspects).

### c. *Exigent circumstances here*

The government advances two theories of exigent circumstances as justifying the warrantless arrest of Tilton and Conner in this case. First, the government suggests that safety considerations created exigent circumstances. Second, the government advances the argument that the threatened destruction of evidence inside the motel room before a warrant could be obtained constituted exigent circumstances. The court will consider each of these arguments in turn.

■ *i. Safety considerations.* It is clear from decisions of the Eighth Circuit Court of Appeals that the test of whether legitimate grounds for a warrantless entry based on safety exist depends upon whether the officers reasonably perceived exigent circumstances to exist. *See, e.g., Vance,* 53 F.3d at 222 ("Exigent circumstances exist ... when law enforcement officials have a 'legitimate concern for the safety' of themselves or others," quoting *United States v. Antwine,* 873 F.2d 1144, 1147 (8th Cir.1989), and therefore, " '[w]hen there is a reasonable fear of harm, a warrantless entry may be justified,' " quoting *United States v. Williams,* 633 F.2d 742, 744 (8th Cir.1980), and affirming the finding of the district court that " 'the officers' stated fears for their safety were reasonable.' "); *see also United States v. McConnell,* 903 F.2d 566, 570 (8th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991); *Antwine,* 873 F.2d at 1147; *United States v. Hill,* 730 F.2d 1163, 1170 (8th Cir.), *cert. denied sub nom. Frazier v. United States,* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984). Here, on the facts presented, the court concludes that the officers' warrantless entry of the motel room was not justifiable on any reasonable belief that safety grounds justified an immediate, warrantless arrest.

First, it must be noted that none of the officers testified that at the time they knocked on the door they harbored beliefs that exigent circumstances existed. Further-

more, the officers' purported fears for their own and the public's safety were unreasonable given the circumstances that confronted them. The officers did not know who was in Room 31 at the time they commanded the occupants to open the door. Furthermore, although the officers had been informed that three firearms had been taken during the Uhlir burglary, they did not know that two pistols had been secreted in the motel room nor that the weapons were loaded. *See United States v. Murphy,* 69 F.3d 237, 243 (8th Cir.1995) (in a "knock and announce" case, which also requires exigent circumstances to dispense with the "knock and announce" requirement, although exigent circumstances may exist when officers fear for their safety, "a 'reasonable belief that firearms may have been within the residence, standing alone, is clearly insufficient' " to establish exigent circumstances, quoting *United States v. Marts,* 986 F.2d 1216, 1218 (8th Cir.1993)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996); *accord United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994) (holding that "[t]he mere presence of firearms does not create exigent circumstances."); *see also United States v. Dawkins,* 17 F.3d 399, 406 (D.C.Cir.1994) (noting that an exigency can never be based solely on the basis that the police have information that firearms are located in residence); *United States v. Gooch,* 6 F.3d 673, 679 (9th Cir.1993) ("The presence of a firearm alone is not an exigent circumstance."); *Killebrew,* 560 F.2d at 733 (where there were no facts indicating that an occupant was dangerous or about to escape, a warrantless entry into the suspect's motel room violated the Fourth Amendment, even though the police knew the occupant possessed a gun). It must be remembered that the burglary the police were investigating had taken place the previous week. The police were not confronted by a situation in which the individuals they were investigating were known to have armed themselves recently, or were known to have a history of violent acts. *See United States v. Bartelho,* 71 F.3d 436, 442 (1st Cir.1995) (the court found exigent circumstances for a search existed where the police were summoned by a caller who identified herself and reported that a woman was

being threatened by a man with a loaded rifle); *Hardy,* 52 F.3d at 149 (finding exigent circumstances where the defendant was suspected in a recent murder, knew he was a suspect, had a history of violent crimes committed with firearms, was known to have been recently armed with a handgun, and an officer peering into the defendant's motel room through the gap in the curtains saw the defendant sitting on the bed with a sawed-off shotgun); *United States v. Lopez,* 989 F.2d 24, 26 (1st Cir.) (holding that a search for weapons was justified by exigent circumstances where the police were responding to a report that a man was threatened with a sawed-off shotgun), *cert. denied,* 510 U.S. 872, 114 S.Ct. 201, 126 L.Ed.2d 158 (1993). Thus, based on the information the officers had, although the officers could have believed that the defendants had weapons, that knowledge does not suffice to establish exigent circumstances. *Murphy,* 69 F.3d at 243; *Marts,* 986 F.2d at 1218; *accord Johnson,* 22 F.3d at 680; *Dawkins,* 17 F.3d at 406; *Gooch,* 6 F.3d at 679; *Killebrew,* 560 F.2d at 733. Absent such information, it was unreasonable for the officers to believe that the presence of suspects inside the motel presented a threat to the lives of the officers or others inside or outside the motel. *See Vance,* 53 F.3d at 222 (the test of whether legitimate grounds for a warrantless entry based on safety exists depends upon whether the officers reasonably perceived exigent circumstances to exist); *Antwine,* 873 F.2d at 1147.

Nor does the seriousness of the offense the defendants were believed to have committed necessarily suggest any exigency. *See Ball,* 90 F.3d at 263 (seriousness of the offense is an important part of the exigent circumstances calculus); *Greiner,* 27 F.3d at 1353 (same); *Clement,* 854 F.2d at 1120 (same). The defendants were believed to have committed a burglary, but the crime itself was not, apparently, an armed robbery in which a threat of force or actual force was used against anyone, which might have justified officers in believing that the defendants

posed a threat to public safety unless they were immediately taken. Instead, this was a routine felony arrest to which the *Payton* rule clearly applies. *Payton,* 445 U.S. at 589–90, 100 S.Ct. at 1381–82 (the Fourth Amendment prohibits police officers from making warrantless and nonconsensual entries into suspects' dwellings to make routine felony arrests).

A further consideration here is the fact that the police had the situation well in hand, with four officers in front of the motel and two officers guarding the rear. *United States v. Templeman,* 938 F.2d 122, 124 (8th Cir.1991) (the court found no exigent circumstances where officers had the defendant's trailer home under surveillance, so that it was unlikely that the defendant would escape). Indeed, the court finds that the circumstances were nearly optimal for officers to obtain a warrant prior to attempting to arrest the defendants. Although there may have been some general concern that the defendants were planning to flee, *see Ball,* 90 F.3d at 263 (recognizing imminent escape as an exigent circumstance); *Parris,* 17 F.3d at 229 (same); *Johnson,* 12 F.3d at 764 (same); *Duchi,* 906 F.2d at 1282 (same); *Clement,* 854 F.2d at 1119 (same), because that was the import of the informant's tip, the defendants had waited a few days since the burglary without hurrying away, and at the time of the entry, the hour was early, there were no signs of preparations to depart, and, most importantly, the officers were in place to arrest the defendants if they had emerged from the motel room and appeared ready to leave. If the defendants had left the motel room as though preparing to depart, the arresting officers would not have had a *Payton* problem at all had they then arrested them.[10] Furthermore, until the officers knocked, there is no indication that the defendants were aware of their presence, such that the officers' own conduct created only an excusable exigency. *Cf. Duchi,* 906 F.2d at 1282 (appearance of officers may precipitate an urgent situation, but that presence does

10. The court does not believe this conclusion is mere "hindsight." *Cf. Ball,* 90 F.3d at 264. Rather, any reasonable evaluation of the situation at the time should have indicated to experienced officers that they were in control of the situation and nothing had "spooked" the defendants prior to the officers' knocking.

not qualify as creating the exigency in such a way as to bar the justification for immediate entry or arrest). Therefore, the court concludes that the record here reveals no safety exigency sufficient to justify the warrantless entry of the motel and the arrest of the defendants.

■ *ii. Destruction of evidence.* Finally, there can be no claim that immediate police action was needed to prevent the imminent destruction of vital evidence. *See Ball,* 90 F.3d at 263 (recognizing possible destruction of evidence as an exigent circumstance); *Parris,* 17 F.3d at 229 (same); *Johnson,* 12 F.3d at 764 (same); *Duchi,* 906 F.2d at 1282 (same); *Clement,* 854 F.2d at 1119. There is absolutely no evidence in the record that either Tilton or Conner were engaged in the destruction of evidence or about to destroy evidence of the Uhlir burglary. When police officers seek to rely on this exception in justifying a warrantless entry, they must show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent. *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1502 (6th Cir.1988); *see United States v. Napue,* 834 F.2d 1311, 1326 (7th Cir.1987). The need to invoke the exigent circumstances exception to the warrant requirement is less compelling here than in a drug case, since, unlike narcotics, which can be easily and quickly destroyed, *see United States v. Young,* 909 F.2d 442, 446 (11th Cir.1990) ("As many courts have noted, the need for the exigent circumstance doctrine is particularly compelling in narcotics cases, because contraband and records can be easily and quickly destroyed while a search is progressing."), *cert. denied,* 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991), many of the items taken in the Uhlir burglary could not be easily nor quickly destroyed. Furthermore, the officers were not confronted with the tell-tale sounds of destruction emanating from within the motel room so as to excuse the absence of a warrant. *See United States v. Bonner,* 874 F.2d 822, 825 (D.C.Cir.1989) (exigency exists where, *inter alia,* "officers heard

sounds consistent with ... destruction of the object of the search"); *United States v. Frierson,* 299 F.2d 763 (7th Cir.1962) (an exigency exists where officers heard "get rid of the stuff; get rid of the spoon"), *cert. denied,* 371 U.S. 963, 83 S.Ct. 544, 9 L.Ed.2d 510 (1963). In sum, there were no exigent circumstances justifying the warrantless intrusion by the police into the motel room occupied by Conner and Tilton.[11] Thus, the court concludes that in the instant case, the officers' warrantless entry into Room 31 was not justified by exigent circumstances founded on fear of destruction of evidence.

### 4. Summary

Because both of the government's grounds for asserting exigent circumstances in this case are untenable, the court concludes that no exception to *Payton*'s warrant requirement has been shown, and the warrantless entry into Room 31 violated the Fourth Amendment. Where a warrantless entry violates the Fourth Amendment standards stated in *Payton,* the court must suppress all evidence tainted by the illegal entry, *Johnson,* 12 F.3d at 765, which in this case may include the evidence subsequently obtained pursuant to warrants if the warrants are tainted by the illegal entry, unless some other ground for sanitizing the evidence is presented. Again, the government argues that there is a further ground to sanitize the seizure of evidence in this case, the good-faith exception set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and its progeny. Therefore, the court must next examine whether the *Leon* good-faith exception applies under the facts of this case.

### C. Search And Seizure

The government argues that even if the arrest of the defendants violated the Fourth Amendment, the evidence found in the motel room and as a result of entering the motel room is nonetheless admissible under the "good-faith exception" set forth in *Leon* and its progeny. In particular, the government

---

**11.** The government has not asserted, and the court cannot find, that the remaining category of "exigent circumstances," the "hot pursuit" ex-

ception, applies here. *See, e.g., Olson,* 495 U.S. at 100, 110 S.Ct. at 1689–90.

relies on a line of Eighth Circuit precedent involving *Terry*-type investigative stops at airports and bus terminals conducted without reasonable suspicion. *See United States v. Fletcher,* 91 F.3d 48 (8th Cir.1996); *United States v. Kiser,* 948 F.2d 418 (8th Cir.1991), *cert. denied,* 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992); *United States v. White,* 890 F.2d 1413 (8th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). The court will begin its analysis of this issue with a review of the Supreme Court's decision in *Leon* and then turn to the decisions of the Eighth Circuit Court of Appeals relied on by the government.

### 1. *Leon and the "good-faith" exception*
#### a. *The Leon decision*

The Eighth Circuit Court of Appeals has noted that "[t]he Fourth Amendment to the United States Constitution does not expressly preclude the use of evidence obtained in its violation," citing *Leon.* *United States v. Johnson,* 78 F.3d 1258, 1261 (8th Cir.) (citing *Leon,* 468 U.S. at 906, 104 S.Ct. at 3411–12), *cert. denied,* ―― U.S. ――, 117 S.Ct. 227, 136 L.Ed.2d 159 (1996). Thus, "[t]he Court in *Leon* created the good-faith exception to the exclusionary rule." *Id.* In *Leon,* the United States Supreme Court held that evidence seized by police officers acting in objectively reasonable good-faith reliance on a search warrant issued by a neutral and detached magistrate, but ultimately found to be unsupported by probable cause, need not be suppressed. *Leon,* 468 U.S. at 922–25, 104 S.Ct. at 3420–22. The Supreme Court noted the division of authority between the judicial officer, whose duty includes "issu[ing] a warrant comporting in form with the requirements of the Fourth Amendment," and the police officer who, in the ordinary case, "cannot be expected to question the magistrate's ... judgment that the form of the warrant is technically sufficient." *Id.* at 921, 104 S.Ct. at 3419.

The Supreme Court explained that the exclusionary rule is a deterrent measure designed to ensure compliance with the Fourth Amendment. *See id.* at 906, 104 S.Ct. at 3411–12; *accord Johnson,* 78 F.3d at 1261 ("The purpose of the exclusionary rule is to

deter police misconduct."); *United States v. Moore,* 956 F.2d 843, 847 (8th Cir.1992) (" '[T]he purpose of the exclusionary rule is to deter unlawful police conduct,' " quoting *United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975)). The Court believed that, where police obtain evidence in reliance on a search warrant that is subsequently found to be defective, "there is no police illegality and thus nothing to deter." *Id.* at 921, 104 S.Ct. at 3419. Hence, exclusion of seized evidence under those conditions serves no salutary purpose, because that sanction "cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* The Supreme Court concluded that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.*

Although *Leon* weakened the exclusionary rule, the Supreme Court did not demonstrate the rule. The Supreme Court acknowledged that suppression would continue to be appropriate in those situations where, notwithstanding the issuance of a warrant, "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* at 919, 104 S.Ct. at 3419. The Supreme Court identified four circumstances in which the exclusionary rule is still appropriate:

> Suppression .... remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his disregard of the truth.... The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role ...; in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." ... Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particu-

larize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Id.* at 923, 104 S.Ct. at 3421 (citations omitted); *Johnson,* 78 F.3d at 1261 (identifying these four circumstances from *Leon* ). However, the ultimate question under *Leon* is whether officers "had an objectively reasonable basis to believe they were complying with [applicable law] and the Fourth Amendment." *Moore,* 956 F.2d at 848 (subsequently, on page 849, rephrasing the question as "whether, under *Leon,* the evidence must be excluded because it was seized in obvious violation of the Fourth Amendment."); *see also United States v. Fletcher,* 91 F.3d 48, 51 (8th Cir.1996) (the "relevant inquiry" was whether the facts surrounding the case were "close enough to the line of validity" that the police officers were entitled to believe their conduct complied with the law). The government bears the burden of establishing that the good-faith exception to the federal exclusionary rule should apply in a particular case. *Id.* at 924, 104 S.Ct. at 3421.

### b. The Fletcher–White line of authority

As noted above, the government relies on a line of Eighth Circuit precedent following *Leon* involving *Terry*-type investigative stops at airports and bus terminals conducted without reasonable suspicion as establishing the applicability of the good faith exception for evidence garnered here as a result of the illegal entry into the motel room. *See Fletcher,* 91 F.3d at 51–52; *Kiser,* 948 F.2d 418; *White,* 890 F.2d 1413. The *White* decision, 890 F.2d 1413, is the origin of this line of authority and illustrative of this group. In *White,* law enforcement officers conducting surveillance for drug couriers at an airport became suspicious of the defendant, because they believed he exhibited drug courier profile characteristics. *Id.* at 1416. The officers approached the defendant and stopped him, and the stop escalated from a consensual encounter into a *Terry*-type investigative stop, which required "reasonable, articulable suspicion to survive Fourth Amendment scrutiny." *White,* 890 F.2d at 1416 (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). While the defendant

was detained, a narcotics detection dog "alerted" to the defendant's carry-on bag. *Id.* at 1415. Based on this evidence, the officers obtained a warrant to search the carry-on bag. *Id.* The bag was then searched and cocaine was found. *Id.* The defendant moved to suppress the fruits of this search, asserting that the officers detained him and his luggage without the required reasonable, articulable suspicion. *Id.* In affirming the admissibility of the cocaine, the Eighth Circuit Court of Appeals held first that the officers, relying on the drug courier profile, lacked the "reasonable, articulable suspicion" required to justify a *Terry* stop. *Id.* at 1419. Therefore, the officers' detention of the defendant and his bag violated the Fourth Amendment. *Id.* Nonetheless, the Eighth Circuit Court of Appeals went on to find the evidence admissible, citing the *Leon* rule that evidence seized pursuant to a warrant, even if obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule, if an objectively reasonable officer could have believed the seizure was valid. *White,* 890 F.2d at 1419. The holding in *White* has been followed in several subsequent decisions of the Eighth Circuit Court of Appeals. *See Fletcher,* 91 F.3d at 51; *United States v. O'Neal,* 17 F.3d 239, 242 n. 6 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994); *Kiser,* 948 F.2d at 421–22.

### c. "Good faith" here

■■■ The factual situation confronting the court here is quite dissimilar from the circumstances presented in the *Fletcher–White* line of cases. In each of those cases, the court confronted *Terry*-type investigative stops conducted at airports and bus terminals without reasonable suspicion. *See Fletcher,* 91 F.3d at 50–51; *Kiser,* 948 F.2d at 422; *White,* 890 F.2d at 1416. In each case, however, the Eighth Circuit Court of Appeals determined that the circumstances gave the police officers an objectively reasonable belief that they possessed a reasonable, articulable suspicion that would make the search warrant valid. *See Fletcher,* 91 F.3d at 52; *Kiser,* 948 F.2d at 422; *White,* 890 F.2d at 1419. In these cases, the Eighth Circuit Court of Appeals emphasized that

"although the facts failed to demonstrate reasonable, articulable suspicion, the facts were 'close enough to the line of validity' that the officers were entitled to a good faith belief that reasonable suspicion existed." *O'Neal*, 17 F.3d at 242 n. 6 (quoting *White*, 890 F.2d at 1419). "It was the closeness of the particular facts that 'push[ed] this case into the gray area created by *Leon*.'" *Id.* (quoting *White*, 890 F.2d at 1419); *see also Fletcher*, 91 F.3d at 51 (the question is whether the facts are "close enough to the line of validity" that officers are entitled to a belief that they have complied with the law).

The court finds it significant that the *Fletcher–White* line of authority has never been extended beyond the factual scenario presented in each of those cases: *Terry*-type investigative stops conducted without reasonable suspicion. Here, by contrast, the officers' actions do not hang on a determination of reasonable suspicion for a *Terry*-type stop. Rather, the court is faced with the officers' unlawful command to open the door of the defendants' temporary dwelling, thus impinging on the occupants' Fourth Amendment protections, *see, e.g., Payton*, 445 U.S. at 589–90, 100 S.Ct. at 1381–82 (warrantless arrests in a suspect's dwelling are presumptively unconstitutional), and the resulting inclusion in the search warrant application of information tainted by the unconstitutional entry. Because the factual circumstances of cases presented in the *Fletcher–White* line are not analogous to the facts in this case, the Eighth Circuit Court of Appeals has not yet approved the expansion of the *Fletcher–White* line of authority to situations not grounded in the "reasonable suspicion" standards, and this court finds another body of law, the *Payton* line of decisions, is instead applicable, the court concludes that the *Fletcher–White* line of authority does not apply here.

Even assuming the *Fletcher–White* line of authority applies to all police actions, the good-faith rule of *Leon* cannot be invoked here. Neither *White* nor *Leon* is "unqualified in [its] application." *O'Neal*, 17 F.3d at 242 n. 6. Under the *Fletcher–White* line of authority the Eighth Circuit Court of Appeals has emphasized that although the facts

failed to demonstrate reasonable suspicion, the facts relied on by the police were, in each case, "close enough to the line of validity" that the officers were entitled to a good-faith belief that reasonable suspicion existed. *See Fletcher*, 91 F.3d at 51; *Kiser*, 948 F.2d at 422; *White*, 890 F.2d at 1419. It was the closeness of the particular facts that "push[ed] this case into the gray area created by *Leon*." *White*, 890 F.2d at 1419.

Here, the court finds the opposite to be true. No officer could in good faith believe, under the facts as they existed at the time, that the defendants consented to the officers' visual or physical access to the motel room. As the court concluded above, Tilton involuntarily opened the door to the motel room pursuant to a command of entry under color of authority. The officers pounded on the door to the defendants' motel room in a manner loud enough to awaken neighbors and alert them to their actions. When Tilton did not respond to the initial actions of the officers, the officers continued to knock and Sergeant Young commanded Tilton to "open the door." Under such circumstances, Tilton's decision to open the motel room door cannot reasonably be construed to be a voluntary one. *See, e.g., Winsor*, 846 F.2d at 1573 (consent was involuntary as a matter of law where officers effected a non-consensual search of the room when they knocked on the door of a hotel room and commanded that it be opened under a claim of lawful authority). Indeed, it flies in the face of common sense to believe that actions done in direct response to a command given by law enforcement officers under color of authority are anything but involuntary. *See Schneckloth*, 412 U.S. at 228, 93 S.Ct. at 2048 ("no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."); *Heath*, 58 F.3d at 1275–76 (consent cannot be the product of coercion); *accord United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.1993) ("Consent must be a product of [the] individual's free and unconstrained choice, rather than a mere acquiescence to a show of authority."), *cert. denied*, 511 U.S. 1130, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994); *United States v. Spires*, 3 F.3d 1234, 1236

854

(9th Cir.1993) (holding that "mere acquiescence" to lawful authority is insufficient to establish voluntary consent to search); *United States v. Vasquez,* 638 F.2d 507, 524 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981) (concluding that "if the individual has merely acquiesced in a show of authority, he should not be found to have consented.").

Furthermore, although it is a close question whether probable cause existed to arrest the defendants based on the information available to officers at the time they gained access to the motel room, which might bring officers close enough to the line to be within the ambit of *Leon* as to probable cause, *O'Neal,* 17 F.3d at 242 n. 6 (the good-faith exception applies when "the facts were 'close enough to the line of validity' that the officers were entitled to a good faith belief that reasonable suspicion existed"), the officers could not in good faith have believed that there were exigent circumstances allowing them to enter the motel room without a warrant. Reasonableness of the officers' belief in the existence of exigencies is part of the exigent circumstances analysis. *See, e.g., Greiner,* 27 F.3d at 1353; *Selberg,* 630 F.2d at 1295. The court has already rejected the reasonableness of any such belief in this case, and reaffirms that conclusion by holding that a belief in exigent circumstances was not close enough to the line to invoke *Leon.* Thus, the court concludes that there was no "objectively reasonable basis [for the officers] to believe they were complying with [applicable law] and the Fourth Amendment," and instead the entry into the motel room was "in obvious violation of the Fourth Amendment." *Moore,* 956 F.2d at 848–49. In these circumstances, the *Leon* good-faith exception is unavailable. *Id.*

As the Supreme Court instructed in *Leon,* "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon,* 468 U.S. at 916, 104 S.Ct. at 3417. Here, the issue is indeed police misconduct, the obtaining of nonconsensual visual and physical access to a dwelling place in violation of the occupants' Fourth Amendment rights as articulated in *Payton.* Thus, deterrence of

that misconduct could and should result from the full impact of the exclusionary rule.

The fact that the police did not actually conduct a full-blown search of the motel room and Conner's residence until after they obtained a search warrant is of little consequence. Obtaining a search warrant could not sanitize the officers' prior misconduct. As the Eighth Circuit Court of Appeals has observed, "If clearly illegal police behavior can be sanitized by the issuance of a search warrant, then there will be no deterrence, and the protective aims of the exclusionary rule will be severely impaired if not eliminated." *O'Neal,* 17 F.3d at 242 n. 6. Thus, because all evidence obtained after the motel room door was opened is the fruit of the officers' unconstitutional initial entry, all such evidence, including the defendants' statements and the objects in plain view in the motel room, must be suppressed. *See Wong Sun,* 371 U.S. at 484–88, 83 S.Ct. at 415–18; *Duchi,* 906 F.2d at 1285. Furthermore, because the court concludes that the method by which the police gained entry to the motel room was unconstitutional, and some of the information supporting the search warrants was gained from that illegal entry, the court must determine whether the evidence obtained through the execution of the search warrants must also be suppressed. *See O'Neal,* 17 F.3d at 242 n. 6 ("If the method by which evidence supporting a search warrant is seized is clearly illegal, then even under *Leon* and *White,* evidence obtained under the resulting warrant should be excluded.").

## 2. *Searches incident to warrants*

The government did not take the next essential step after arguing for applicability of the *Leon* "good-faith" exception, which was to argue that even if the *Leon* exception was inapplicable, the searches incident to warrants were still constitutionally valid, because the warrants were based, at least in part, on information from sources independent of the unconstitutional entry. The court is at a loss to understand such an oversight, but nonetheless finds that it must consider whether the seizures pursuant to search warrants are independently valid.

### a. The "independent source" rule

Specifically, the court proceeds to the final question: whether the search warrants for the motel room and Conner's home in Sloan, obtained after the coins and other materials were observed in the motel room, each constituted an "independent source" of the evidence justifying the evidence's admissibility. In *United States v. Warren*, 16 F.3d 247 (8th Cir.1994), the Eighth Circuit Court of Appeals gave a brief explanation of the nature and effect of the "independent source" rule in a case in which the court found an entry into premises prior to obtaining a search warrant was unconstitutional:

> The motion to suppress was properly denied because the search warrant was not based on any evidence discerned from the entry and protective sweep. *See Segura v. United States*, 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984). In *Segura*, the Supreme Court found that evidence obtain[ed] pursuant to a valid search warrant, but after an illegal entry, was properly admissible because the government learned of the evidence from an independent source. *Id.* Similarly, here, the search warrant was not based upon any information obtained from the entry or the protective sweep[;] rather the warrant was based upon wholly independent information. The exclusionary rule does not apply to evidence that is not tainted by a prior unconstitutional search or seizure. *See id.* at 804, 104 S.Ct. at 3385.

*Warren*, 16 F.3d at 253; *see also United States v. Mithun*, 933 F.2d 631, 634–36 (8th Cir.) (also considering whether a search warrant was "tainted" by a police officer's earlier, unconstitutional search, or instead was an independent source for the evidence seized), *cert. denied*, 502 U.S. 869, 112 S.Ct. 201, 116 L.Ed.2d 161 (1991). However, in a case in which the evidence was seized immediately upon an illegal entry, the Eighth Circuit Court of Appeals found the rule of *Segura* inapplicable. *Marts*, 986 F.2d at 1220. The court must therefore consider whether the seizures of evidence at the motel room or the search warrants for the motel room and for Conner's residence in Sloan were or were not "tainted by [the] prior unconstitutional

search or seizure," that is, tainted by the illegal entry into the motel room. *Id.*

In a decision subsequent to *Segura*, the case upon which the *Warren* decision relied, the Supreme Court also explained that the "independent source" doctrine "applie[s] to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988). In *Murray*, the Court concluded that, if the warrants were "genuinely independent" of the prior illegal searches, the evidence obtained through execution of the warrants should not be suppressed. *Id.* at 543, 108 S.Ct. at 2536.

In *Murray*, police officers obtained a search warrant for a warehouse after they already had entered it and observed bales of what they suspected was marijuana. *Id.* at 535–36, 108 S.Ct. at 2532–33. The warrant application did not disclose what had been seen during the prior illegal search of the warehouse. *Id.* at 536, 108 S.Ct. at 2532–33. Instead of announcing a *per se* rule excluding evidence discovered under such circumstances, the Supreme Court held that " 'information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source.' " *Id.* at 538–39, 108 S.Ct. at 2533–34 (quoting *United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988)); *see also Mithun*, 933 F.2d at 635 ("In *Murray*, where a search warrant was obtained after an illegal entry, the Supreme Court held that the evidence seized during the warrant search was admissible if the search warrant was the product of independent sources of information, rather than information obtained during the illegal entry."). Grounded "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied [but for the illegal activity]," *id.* at 542, 108 S.Ct. at 2535, the Court remanded to determine whether "the agents would have sought a warrant if they had not earlier entered the warehouse." *Id.*

at 543, 108 S.Ct. at 2536. Therefore, here, *Murray* instructs this court that it must determine "whether the search pursuant to warrant was in fact a genuinely independent source.... This would not be the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his [or her] decision to issue the warrant." *Id.* at 542, 108 S.Ct. at 2536.

In a decision discussing both *Segura* and *Murray, United States v. Estrada*, 45 F.3d 1215 (8th Cir.), *cert. granted and vacated on other grounds*, —— U.S. ——, 116 S.Ct. 664, 133 L.Ed.2d 516 (1995),[12] the Eighth Circuit Court of Appeals, looking first to *Segura*, considered whether information upon which a search warrant was secured " 'came from sources wholly unconnected with the [illegal] entry and was known to the agents well before the initial entry,' " *Estrada*, 45 F.3d at 1220 (quoting *Segura*) then noted that the Supreme Court in *Murray* had addressed an important issue not dealt with in *Segura*: "whether evidence in plain view at the time of an earlier illegal entry must be suppressed when seized pursuant to a later search warrant secured upon information wholly unconnected with the illegal entry." *Id.* In both cases, the Eighth Circuit Court of Appeals found, the question was whether the evidence was obtained by means independent of the illegal entry. *Id.* at 1221. To make that decision, the Eighth Circuit Court of Appeals found, the Court in *Murray* directed that courts "should determine whether the warrant would have been sought 'even if what actually happened had not occurred ... what counts is whether the actual illegal search had any effect in producing the warrant, not whether some hypothetical illegal search would have aborted the warrant.' " *Estrada*, 45 F.3d at 1221 (quoting *Murray*, 487 U.S. at 542 n. 3, 108 S.Ct. at 2536 n. 3). The Eighth

Circuit Court of Appeals concluded that where officers testified credibly that they would have applied for the search warrant even if there had been no prior illegal entry, the independent source rule permitted admission of evidence obtained pursuant to the warrant, whether that evidence only came to light because of the warrant or was in plain view during the illegal entry, but later obtained independently pursuant to the warrant. *Id.* at 1221.

In ascertaining whether the "independent source" doctrine applies, the Eighth Circuit Court of Appeals, following *Murray*, has found that the "question turned on whether 'the agents' decision to seek the warrant was prompted by what they had seen during the [illegal] entry, or [whether] information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.' " *Mithun*, 933 F.2d at 635 (quoting *Murray*, 487 U.S. at 542, 108 S.Ct. at 2535–36). Other courts have applied a more formal two-part test: In order for evidence to remain admissible after execution of a search warrant based, in part, on a prior illegal search, "(1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir.), *cert. denied*, 510 U.S. 959, 114 S.Ct. 418, 126 L.Ed.2d 364 (1993); *accord United States v. Hassan*, 83 F.3d 693, 695 (5th Cir. 1996) (applying this two-part test); *United States v. Walton*, 56 F.3d 551, 554 (4th Cir. 1995) (applying this two-pronged test); *United States v. Hill*, 55 F.3d 479, 480–81 (9th Cir.1995) (noting this two-part test and remanding for the district court to make a finding as to whether the police would have sought a warrant if they had not earlier entered the defendant's house); *United*

---

12. The Supreme Court granted certiorari and vacated this decision for reconsideration in light of *Bailey v. United States*, 516 U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). On remand, the Eighth Circuit Court of Appeals reconsidered Estrada's conviction of carrying a firearm in relation to drug trafficking in violation of 18 U.S.C. § 924(c)(1). *United States v. Estrada*, 85

F.3d 365, 366 (8th Cir.1996). On remand, the court reversed that conviction for lack of evidence. *Id.* However, neither the Supreme Court nor the Eighth Circuit Court of Appeals on remand revisited the appellate court's prior discussion of or determination on the independent source rule.

*States v. Markling,* 7 F.3d 1309, 1315–18 (7th Cir.1993) (employing this two-part test), *cert. denied,* —— U.S. ——, 115 S.Ct. 1327, 131 L.Ed.2d 206 (1995); *United States v. Restrepo,* 966 F.2d 964, 968–72 (5th Cir. 1992) (employing this two-part test), *cert. denied sub nom. Pulido v. United States,* 506 U.S. 1049, 113 S.Ct. 968, 122 L.Ed.2d 124 (1993); *United States v. Herrold,* 962 F.2d 1131, 1144 (3d Cir.) (holding that the independent source exception allowed admission of cocaine and drug paraphernalia where agents had entered the defendant's trailer unlawfully, seen the inculpatory evidence in plain view, and immediately applied for a search warrant without seizing the evidence), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992); *United States v. Halliman,* 923 F.2d 873, 880–81 (D.C.Cir. 1991) (applying this two-part test); *cf. United States v. Beltran,* 917 F.2d 641, 644 (1st Cir.1990) (Breyer, C.J.) (noting in dicta that "a warrant that rests upon information obtained through an unlawful arrest is invalid unless the government shows not only that it had enough lawfully obtained information to justify the warrant but also that it would have applied for the warrant in the absence of the unlawful arrest").

### b. The "independent source" analysis here

**■■■■ i. Probable cause prong.** The first prong of the test may be described as the "probable cause" prong of the analysis, because the court must ask whether the warrant is supported by probable cause derived from sources independent of the illegal entry, *see, e.g., Johnson,* 994 F.2d at 987, or, in the terms employed by the Eighth Circuit Court of Appeals in *Mithun,* whether information obtained during the illegal entry was presented to the magistrate or judge and affect-

ed his or her decision to issue the warrant. *Mithun,* 933 F.2d at 635 (actually listing this as the second prong of the analysis). The Eighth Circuit Court of Appeals has reiterated the requirements stated in *Segura* and *Murray* that the information upon which an adequate warrant is based must be "wholly independent" of information gained during the illegal entry. *Estrada,* 45 F.3d at 1220 (finding such independence where adequate information to support the warrant had been obtained long before the illegal entry). When, as is the case here, an application for a search warrant includes both·tainted and untainted evidence, the court concludes that the search warrant may be upheld if the untainted evidence, standing alone, establishes probable cause.[13] *See Restrepo,* 966 F.2d at 968–71; *Herrold,* 962 F.2d at 1140–43; *see also Laaman v. United States,* 973 F.2d 107, 115 (2d Cir.1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *United States v. Oakley,* 944 F.2d 384, 386 (7th Cir.1991), *cert. denied,* 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992); *United States v. Salas,* 879 F.2d 530, 537 (9th Cir.), *cert. denied,* 493 U.S. 979, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989). To suppress evidence under such circumstances without regard to the extent to which the warrant was based on untainted evidence would "put the police (and society) not in the same position they would have occupied if no violation occurred, but in a worse one." *Murray,* 487 U.S. at 541, 108 S.Ct. at 2535 (citing *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984)).

Here, however, the court finds that without the information the officers discovered when they looked into or entered the motel room, the search warrant applications fail to establish probable cause to search either the

---

**13.** This approach is a logical application of the Supreme Court's holding in *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978). In *Franks,* the Court held that when a government agent deliberately or recklessly includes false information in a warrant application, the warrant is still valid if the other information in the application, standing alone, is sufficient to establish probable cause. *Id.* If the officers had lied on the search warrant application about knowing what defendants possessed in the motel room, *Franks* would permit the court

to uphold the warrant if the other information in the application established probable cause. If the court may uphold a search warrant based on an application that includes false information, if the other information in the application establishes probable cause, it is logical to conclude that a court may uphold a warrant based on an application including illegally obtained information under the same circumstances. In both instances the tainted material is not considered in the court's analysis of the sufficiency of the warrant.

motel room or Conner's residence. The information in the warrant application for the motel room, prepared by Detective Polak, that is "wholly independent" of the illegal entry, *Estrada*, 45 F.3d at 1220, consists of the following: a burglary had occurred, the police had received an anonymous tip that two named persons had been involved in this burglary, that they were staying at a local motel, that they were driving a red 1986 Pontiac Fiero, and that the Fiero had been spotted in front of the Elmdale Motel Room 31. The warrant application is totally bereft of any information that the motel room would house any evidence of the burglary. Indeed, with the tainted information excised, the warrant application states no more than what the officers knew when they approached the motel room, and the government has conceded that information was insufficient to establish probable cause for an arrest of the defendants or search of the motel room. As noted above, in determining whether probable cause exists to believe that evidence of a crime is presently to be found in a certain place, a court must consider the totality of the circumstances. *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. Considering the totality of the circumstances, the search warrant application prepared by Polak, less the tainted information, does not establish probable cause to believe that evidence of the Uhlir burglary would be located in Room 31. Thus, if the warrant was supported by probable cause at all, that probable cause came from information garnered in the illegal entry to the motel room. The search warrant for Conner's residence suffers from the same defect. Thus, both warrants fail the "probable cause" prong of the "independent source" test, *see, e.g., Mithun*, 933 F.2d at 635 (describing one prong of the test as whether information obtained during the illegal entry was presented to the magistrate or judge and affected his or her decision to issue the warrant); *accord Johnson*, 994 F.2d at 987 (identifying the first prong of the test as whether the warrant is supported by probable cause derived from untainted information), and the warrants therefore cannot sanitize any of the evidence obtained after the illegal entry into the motel room. Nonetheless, the court will also consider whether the warrants would

satisfy the second prong of the "independent source" test.

■ *ii. The motivation prong.* The second prong of the "independent source" rule test is "whether 'the agents' decision to seek the warrant was prompted by what they had seen during the [illegal] entry.'" *Mithun*, 933 F.2d at 635 (quoting *Murray*, 487 U.S. at 542, 108 S.Ct. at 2536); *accord Johnson*, 994 F.2d at 987 (stating the second prong as whether the decision to seek the warrant was prompted by information gleaned from the illegal conduct). This prong might properly be described as the "motivation" prong, because it considers the officers' motivation in seeking the warrant.

In assessing motivation, the court must consider whether the officers would have applied for the search warrants if they had not looked into or entered the defendants' motel room. *Estrada*, 45 F.3d at 1221 (where officers testified credibly that they would have applied for the search warrant even if there had been no prior illegal entry, the independent source rule permitted admission of evidence obtained pursuant to the warrant). Other courts and commentators have put the question in a similar way: *"Murray* instructs the trial court to determine ... whether information gleaned through the illegal search influenced or motivated the officers' decision to procure a warrant." *Restrepo*, 966 F.2d at 971; *see generally* 5 Wayne R. LaFave, Search and Seizure § 11.4(f) (3d ed.1996) (pointing out that *Murray* instructs that even if the illegality unquestionably contributed not at all to the magistrate's decision to issue the warrant, the warrant is nonetheless tainted if the illegally obtained facts prompted the agents' decision to seek the warrant.).

On this issue, the court concludes that the officers would not have sought either search warrant but for their illegal entry into the motel room. The government has conceded that the officers lacked probable cause when they first approached the motel room. Even if the officers had probable cause when Detective Iddings's observation of coins on the windowsill is added in, the court finds that it was only after observing what the officers believed were the proceeds of the Uhlir bur-

glary *in the motel room* that the officers first thought to obtain the search warrants at issue here. Detective Iddings's observations are not included in the search warrant applications. Therefore, the court concludes the search warrants also fail the second prong of the "independent source" test, because the applications for the warrants were specifically motivated by what the officers saw as the result of their illegal entry into the motel room. *See Mithun*, 933 F.2d at 635 (whether the officers were motivated to seek a warrant by information gained from an illegal source is one prong of the inquiry); *accord Johnson*, 994 F.2d at 987.

Because all of the evidence obtained by police following entry into the motel room, including the defendants' statements, all evidence found in the motel room, and all evidence found at Conner's residence, whether the evidence was obtained pursuant to a warrant or not, was not procured through an "independent source," but was instead obtained in the illegal entry into the motel room or was tainted by that illegal entry, all such evidence must be suppressed.

## IV. CONCLUSION

The court concludes that both of the defendants have standing to assert their claims of constitutional violations, because both possessed a reasonable expectation of privacy in Room 31 of the Elmdale Motel. The court concludes further that the evidence obtained in the entry into the motel room was obtained either at the wrong time or in the wrong way. First, the court concludes that entry into the room was gained in the wrong way, because Tilton opened the door to the motel in response to a show of official authority, not voluntarily or by consent.

The next significant flaw in the arrest of the defendants and seizure of evidence in this case is one of timing. Although the court finds that a law enforcement officer did not violate the Fourth Amendment by viewing objects on the windowsill within the room through the room's window, the court has considerable doubt that those observations became part of the collective knowledge of the police officers present, because they were never communicated. Even with those ob-

servations considered as part of the collective knowledge of the officers, the court has considerable doubt that the officers had probable cause to arrest the defendants. The timing flaw, however, is that, assuming the officers had probable cause to arrest the defendants when the officers knocked on the motel room door, the court concludes that the officers erred by not waiting to obtain a warrant to effect the defendants' arrest. The warrantless entry into Room 31 was not justified by exigent circumstances, on either safety or destruction of evidence grounds. As a result, the conduct of the police in arresting the defendants within the motel room violated *Payton* and its progeny.

Again finding constitutional inadequacies in the way the arrest and searches were conducted in this case, the court concludes that because the method by which the police garnered the pivotal evidence supporting the search warrants was clearly illegal, under *Leon* and *White* all evidence obtained under the resulting warrants must be excluded notwithstanding the government's assertion of the *Leon* good-faith exception. No objectively reasonable basis for believing the entry into the motel room complied with the law or the Fourth Amendment can be found here. Finally, the court concludes that the evidence found in the motel room and Conner's residence was not procured through an independent source. Instead, all of the evidence obtained in this case after entry into the motel room, even evidence obtained pursuant to search warrants, was tainted by the illegal entry.

Therefore, the defendants' motions to suppress are **granted.** All of the evidence against the defendants gained as a result of the initial illegal entry into the motel room, including statements made by the defendants, as well as the other fruits of the officers' unconstitutional initial entry, is **suppressed.**

**IT IS SO ORDERED.**